1
2
3
4
5

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY ADAM ELIZALDI, | 1:03-cv-06945-TAG HC |
| Petitioner, | ORDER DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (Doc. 9) |
| vs. | ORDER DENYING MOTION TO PRESENT BEFORE THE COURT RECENT CASE LAW AS MOOT (Doc. 25) |
| SCOTT P. RAWERS, | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner is in custody of the California Department of Corrections and Rehabilitation as a result of a conviction for burglary in the Superior Court of California, County of Fresno (the "Superior Court"). (Clerk's Transcript on Appeal ("CT") 301). Petitioner was sentenced to a doubled base term of eight years for the substantive offense, plus consecutive terms of one year and five years based, respectively, on enhancements pursuant to California Penal Code § 667.5(b) and § 667(A). (Id.).

Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"). (Doc. 18, Exh. A). Petitioner contended in his direct appeal that (1) the trial court abused its discretion in denying his request for a pre-trial lineup; (2) the court erroneously

1

denied his request to inspect the scene of the burglary; (3) the court erroneously denied his

motion to exclude evidence of the victim's identification of him; and (4) the court erroneously

admitted photographs of the crime scene.  (Id.).

On August 6, 2001, the 5th DCA, in an unpublished decision, affirmed Petitioner's

conviction and sentence.  (Doc. 18, Exh. D).  Petitioner timely filed a petition for review in the

California Supreme Court raising those same grounds.  (Doc. 18, Exh. E).  On October 24, 2001,

the California Supreme Court denied Petitioner's petition for review.  (Doc. 18, Exh. F).

On September 25, 2002, Petitioner filed a state habeas petition with the Fresno County

Superior Court.  (Doc. 18, p. 2)   Petitioner raised the following claims: (1) the photographic

lineup was impermissibly suggestive; (2) the investigators and prosecutors committed perjury

and obstructed justice by coaching the witness and destroying original documents that

substantiated Petitioner's alibi, harassing an alibi witness during cross-examination, and making

improper argument; (3) the trial court abused its discretion in denying Petitioner's request for a

pre-trial lineup, denied Petitioner's request to view the burglary scene, wrongly instructed the

jury with CALJIC No. 17.41.1, and refused to allow evidence of third-party culpability; (4) trial

counsel rendered ineffective assistance by not calling expert ophthalmic witnesses, not

investigating more aggressively a theory of third-person culpability, withholding alibi evidence,

not objecting to prosecutorial misconduct, and not arguing third-party culpability; (5) appellate

counsel was ineffective in failing to present meritorious issues on appeal and in not filing a

petition for writ of habeas corpus; and (6) actual innocense.  (Doc. 18, p. 3).

The Superior Court denied the habeas petition on October 4, 2002.  (Id., Exh. G).  In

denying the petition, the Superior Court imposed procedural bars to Petitioner's claims.  On the

claims of actual innocence, prosecutorial misconduct, trial court errors, and ineffective assistance

of counsel, the Superior Court rejected the claims because they could have been, but were not,

raised on Petitioner's direct appeal, pursuant to In re Robbins, 18 Cal.4th 770 (1998); In re

Harris, 5 Cal.4th 813 (1993), In re Clark, 5 Cal.4th 750 (1993), and In re Dixon, 41 Cal.2d 756

(1953).  (Doc. 18, Exh. G).  The court also rejected Petitioner's claims concerning "lineup, crime

scene, victim identification, and photographic evidence," along with his claim of ineffective

assistance of counsel, under <u>In re Waltreus</u>, 62 Cal.2d 218, 221 (1965), because the claims had already been raised in his direct appeal and held to be without merit.  (<u>Id</u>.).   The Superior Court concluded that Petitioner's challenge to CALJIC No. 17.41.1 had been rejected by the California Supreme Court in <u>People v. Engelman</u>, 28 Cal.4th 436 (2002).  (<u>Id</u>.).

On October 28, 2002, Petitioner filed a habeas petition in the 5th DCA, raising the same issues he had raised in Superior Court.  (Doc. 18, Exh. H).  On September 18, 2003, the 5th DCA denied the petition.  (Doc. 18, Exh. K).  On September 26, 2003, Petitioner filed a habeas petition in the California Supreme Court raising the same claims as he had in the prior two state habeas petitions.  (Doc. 18, Exh. L).  This petition was denied on July 14, 2004.  (Doc. 18, Exh. M).

On December 30, 2003, Petitioner filed the instant petition for writ of habeas corpus. (Doc. 1).  On April 9, 2004, Petitioner filed an amended petition.  (Doc. 9).   On October 15, 2004, Respondent filed a response to the amended petition.  (Doc. 18).  On February 17, 2005, Petitioner filed his Traverse.  (Doc. 24).

Respondent concedes that Petitioner's grounds for relief in the amended petition have been fully exhausted.  (Doc. 18, p. 5).   However, Respondent contends that Petitioner's claims of prosecutorial misconduct and investigative misconduct, as set forth in the first ground for relief, are procedurally barred from federal review in light of the state court's imposition of a procedural bar under <u>Dixon</u>.

## FACTUAL BACKGROUND

The Court hereby adopts the Statement of Facts contained in the 5th DCA's unpublished opinion in this case:

> The victim, Kim Sneed, is a nurse who works the night shift at a Fresno hospital.  On the morning of December 9, 1998, at 7:50 a.m., the victim arrived home at her townhouse after work.  She locked her doors and went to bed between 9 and 9:30 that morning.  There was one window in her bedroom that had mini blinds and a valance at the top.  Although the mini blinds were closed, there was enough light in her bedroom to keep her awake.  In order to go to sleep the victim covered her head with blankets.  The victim woke up a short while later when she felt someone brush up against her bed.  The victim pulled the covers away from her head and saw a man standing in her room bending down at the waist.  He was approximately three feet away from her at the time.  She asked the man what he was doing there and he replied that he was looking for a friend.  The victim asked him how he got insider her home and he stated that the front door was open.  During this exchange the victim was looking at the man's face which was two and one-

half to three feet from her face.  The victim started to yell at the man to get out and he began backing away.  Then the man ran down the stairs and the victim gave chase.  When she got downstairs, the victim did not see anyone so she went out her front door.  While outside, she heard some noise in the garage and thought someone could be inside.  She reached behind her and slammed the front door shut while remaining outside, and saw a man run from her garage to a car parked in the parking lot.  The man had difficulty getting into the vehicle and starting it.  Once inside, the man looked at her twice in the rearview mirror, making eye contact with her, and drove away.  The victim described the vehicle as an older model beige or light color car with silver molding on the sides.

After the man drove off, the victim contacted one of her neighbors who called 911.  The 911 operator received the call at 11:30 a.m. and dispatched an officer.  Officer Shreve arrived on the scene at approximately 11:40 a.m.  He observed that the deadbolt to the front door had been pried open.  The victim described the man to him as a Hispanic male, 25-30 years old, 5'8" to 5'10" tall, 185-195 pounds, with black hair, brown eyes, and a mustache.  She stated that he was wearing a black or blue cap, a white or blue jacket, jeans, and work boots.  The victim had told the 911 operator that the man was wearing tennis shoes.  Officer Shreve testified that the victim told him that she had viewed the man leaving the area by looking through the peephole in her front door, although the victim was adamant at trial that she never said she looked through the peephole.  The victim denied that she needed glasses to drive, although she admitted she sometimes needed them to read.

At approximately 5 p.m on the day in question Detective Grove contacted the victim and asked her if she could identify the man she saw in her apartment.  The detective showed the victim a six person photographic lineup that contained a two-year-old picture of appellant.  The victim identified appellant as the man she saw in her apartment.  According to Detective Grove, the victim was able to pick out appellant after only a few seconds, and when she saw him she started to cry and wail.  The victim commented that appellant's mustache appeared a little darker in person than it did in the photograph.  She testified that she was 150 percent sure that the man in the photograph was the man who broke into her home.

Two days later, Detective Grove asked the victim if she could identify the car she saw appellant leave in.  The detective drove the victim to a parking lot that contained approximately 200 vehicles and drove through to see if the victim recognized any of them.  When the victim saw the car appellant previously admitted to driving on the day of the crime, she began to cry and said that it was the one.  She asked the detective to back up so that she could see the side of the car to be absolutely sure.  Detective Grove stated there were about six other cars in the parking lot which were of the same age, size, shape and color as the car the victim identified.

**Defense Case**

Appellant presented an alibi defense.  Appellant was living with his fiancee Felicia Quintero, on the day of the offense.  According to his fiancee, appellant was with her on the morning in question.  He woke up at 7:30 that morning and left in her car which was a 1985 Oldsmobile.  He arrived home at approximately 10:40 a.m. and helped her take care of their child while she showered and got ready to take her daughter to school.  Shortly after 11:25 a.m., Quintero, her daughter, the baby and appellant left in her car to take her daughter to school.  They arrived at the school shortly after 11:30 and Quintero had appellant wait in the car with the baby while she took her daughter to the classroom.  A teacher verified that appellant's fiancee dropped the child off at the school between 11:30 and 11:45.  After dropping off her daughter, Quintero and appellant went to the supermarket, ate lunch, purchased gas, and stopped at an auto parts store.

4

Hope Chacon, who was acquainted with appellant and Quintero, testified that she saw appellant at the school that morning at 11:30 when she drove by. She remembered the date because she almost struck Quintero and her daughter as they were crossing the street to go to the school.

Defense investigator Myrl Stebens, interviewed the victim at her home. He gave the victim Officer Shreve's report and asked her if it was accurate. She said that it was. Stebens asked the victim to demonstrate how she looked out of the peephole to watch the perpetrator leave the area and the victim complied. After demonstrating how she looked out of the peephole on the day of the incident and answering a few questions about her observations, the victim asked Stebens if she was required to continue speaking with him. He said that she was not and she went to make a phone call. While the victim was on the phone, Stebens made some observations from the peephole and found that he did not have an unobstructed view of the parking lot. When the victim returned from her telephone call, she terminated the interview. Later Stebens observed the victim drive away while wearing glasses.

(Doc. 18, Exh. D, pp. 2-5).

## DISCUSSION

### I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d). Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the AEDPA, which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The original petition was filed on December 30, 2003, after the enactment of the AEDPA, and thus it is governed by the AEDPA.

### II.  Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the adjudication of a prisoner's claim (1) "resulted in a decision that was contrary to, or involved

5

1  an unreasonable application of, clearly established Federal law, as determined by the Supreme

2  Court of the United States" or (2) resulted in a decision that "was based on an unreasonable

3  determination of the facts in light of the evidence presented in the State court proceeding."

4  28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529

5  U.S. at 412-413.

6        The first prong of federal habeas review involves the "contrary to" and "unreasonable

7  application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and

8  mixed questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford,

9  384 F.3d 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established

10  federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

11  Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

12  [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

13  (2005), citing Williams v. Taylor, 529 U.S. at 405.  A state court decision involves an

14  "unreasonable application" of clearly established federal law "if the state court applies [the

15  Supreme Court's precedents] to the facts in an objectively unreasonable manner."  Brown v.

16  Payton, 544 U.S. at 141.  Consequently, a federal court may not grant habeas relief simply

17  because the state court's decision is incorrect or erroneous; the state court's decision must also be

18  objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 511 (2003),  citing Williams v.

19  Taylor, 529 U.S. at 409.  Section 2254(d)(1)'s reference to "clearly established Federal law"

20  refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time

21  of the relevant state-court decision."  Williams v. Taylor, 529 U.S. at 412; Lockyer v. Andrade,

22  538 U.S. at 412; Barker v. Fleming, 423 F. 3d 1085, 1093 (9th Cir. 2005).

23        The second prong of federal habeas review involves the "unreasonable determination"

24  clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual

25  findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).

26  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

27  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

28  facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

1   U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual

2   determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is

3   adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so

4   clearly incorrect that it would not be debatable among reasonable jurists."  Id. ; see Taylor v.

5   Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038

6   (2004).  The AEDPA also requires that considerable deference be given to a state court's factual

7   findings. A state court's factual findings are  presumed to be correct, and such presumption of

8   correctness may be rebutted only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

9       To determine whether habeas relief is available under § 2254(d),  the federal court looks

10  to the last reasoned state court decision as the basis of the state court's decision.  Robinson v.

11  Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's

12  claims on the merits but provided no reasoning for its decision, the federal habeas court must

13  independently review the record to determine whether habeas corpus relief is available under §

14  2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d

15  976, 981-982 (9th Cir. 2002).  Where the state court denied the petitioner's claims on procedural

16  grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do

17  not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan,

18  313 F.3d 1160, 1167 (9th Cir. 2002).

19  **III.  Review of Petitioner's Claims.**[1]

20      The amended petition alleges the following as grounds for relief:

21

22  **Ground One**          **Prosecutorial and investigatory misconduct.**

23  **Ground Two**          **The trial court abused its discretion in denying Petitioner's**
                            **request for a pretrial lineup, prohibiting the defense from**
24                          **viewing the crime scene, instructing the jury with CALJIC**

25      [1]Petitioner also asserts as a ground for habeas relief that he is actually innocent. (Doc. 9, pp. 9-10). Indeed,
26  Petitioner's repeated assertion of his actual innocence is a drumbeat that reverberates throughout his amended
    petition.  However, claims of actual innocence have never been held to state a ground for federal habeas relief absent
27  an independent constitutional violation occurring in the underlying state criminal proceeding.  Herrera v. Collins,
    506 U.S. 390, 400 (1993).  To the contrary, on habeas review, the Court does not deal with "the petitioners'
    innocence or guilt but solely the question whether their constitutional rights have been preserved."  Moore v.
28  Dempsey, 261 U.S. 86, 87-88 (1923).  Thus, although this Court will consider in this Order each of Petitioner's
    claims of constitutional violations, it will not separately consider a claim of actual innocence by itself.

**17.41.1, and denying admission of evidence of third-party culpability.**

**Ground Three**          **Ineffective assistance of trial counsel.**

**Ground Four**           **Ineffective assistance of appellate counsel.**

**Ground One**            **Prosecutorial and investigatory misconduct.**

**A.  <u>Ground One Is Procedurally Barred.</u>**

Before turning to the merits of Petitioner's contentions, it is necessary to address Respondent's argument that Ground One is procedurally barred under <u>Dixon</u>, 41 Cal.2d 756.  (Doc. 18, p. 12).

A federal court will not review claims in a petition for writ of habeas corpus if the state court has denied relief on those claims based on a state procedural law.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991);  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-730 (1989); <u>Park v. California</u>, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . .").  This concept has been commonly referred to as the procedural default doctrine.  This doctrine of procedural default is based on concerns of comity and federalism.  <u>Coleman</u>, 501 U.S. at 730-732    The mere occurrence of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both *adequate* to support the judgment and *independent* of federal law.  <u>Ylst v. Nunnemaker</u>, 501 U.S. at 801;  <u>Coleman v. Thompson</u>, 501 U.S. at 729-730.  Put another way, the procedural default doctrine will apply only if the application of the state procedural rule provides "an adequate and independent state law basis" on which the state court can deny relief.  <u>Park</u>, 202 F.3d at 1151, quoting <u>Coleman v. Thompson</u>, 501 U.S. at 729-30.

Provided that the state procedural rule is grounded in state law that is both adequate to support the judgment and independent of federal law, a federal court will be barred from reviewing the merits of a claim only if the state court "unambiguously, clearly and expressly state[d] that its judgment rested on a state procedural bar."  <u>Harris v. Reed</u>, 489 U.S. 255, 262-263 (1989).  For

///

8

California Supreme Court decisions, this means the California Supreme Court must specifically say that it is denying relief on a procedural ground. <u>Ylst v. Nunnemaker</u>, 501 U.S. at 803; <u>Acosta-Huerta v. Estelle</u>, 7 F.3d 139, 142 (9th Cir. 1993); <u>Hunter v. Aispuro</u>, 982 F.2d 344, 347-348 (9th Cir. 1991). If the California Supreme Court denies a petition's claims without any comment or citation, the federal court must consider that it is a decision on the merits. <u>Hunter</u>, 982 F.2d at 347-348.

There are two final exceptions to procedural default. The federal court may still consider the claim if the petitioner can demonstrate (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. <u>Harris</u>, 489 U.S. at 262; <u>Coleman</u>, 501 U.S. at 750.

## 1. <u>In re Dixon</u> ("The Dixon Rule").

In this case, the Superior Court denied Petitioner's state habeas corpus petition, ruling that his claims of "prosecutor misconduct, errors committed by the trial court, and ineffective assistance of counsel" were "primarily based on matters contained with existing court records," and, as such, "normally must be raised by way of appeal, not by way of writ petition." (Doc. 18, Exh. G, p. 1). In so ruling, the state court cited <u>Robbins</u>, 18 Cal.4th 770, <u>Harris</u>, 5 Cal.4th 813, <u>Clark</u>, 5 Cal.4th 750, and <u>Dixon</u>, 41 Cal.2d 756. (<u>Id.</u>).

<u>Dixon</u> established California's procedural rule providing that, in a habeas corpus proceeding, a California court will not review the merits of a claim if that claim could have been raised, but was not, in a timely appeal. <u>Dixon</u>, 41 Cal.2d at 759 ("[I]n the absence of special circumstances constituting an excuse for failure to employ [the] remedy [of direct review], the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"); <u>see</u> <u>In re Harris</u>, 5 Cal.4th at 823 (explaining <u>Dixon</u> rule).

Under California law, even if a state court petitioner fails to bring a claim on direct appeal from a conviction, a California court will nevertheless hear the merits of case if the court finds one of four exceptions to the <u>Dixon</u> bar to be applicable: 1) fundamental constitutional error; 2) a lack of fundamental jurisdiction by the trial court over the petitioner; 3) the trial court's acting in excess of jurisdiction; and 4) an intervening change in the law. <u>Fields v. Calderon</u>, 125 F.3d 757, 763 (9th Cir. 1997), <u>quoting</u>, <u>In re Harris</u>, 5 Cal.4th at 828-842.

In the instant case, petitioner pursued a direct appeal.  Thereafter, Petitioner presented claims to the California courts for collateral review in a petition for writ of habeas corpus.  However, all of Petitioner's habeas claims could have been, and were, presented on Petitioner's direct appeal. Therefore, the Superior Court invoked the principles of the <u>Dixon</u> rule for alleging claims in a petition for writ of habeas corpus which should have been raised on direct review.

Even when a petitioner has violated a state procedural rule, the procedural default doctrine does not bar federal habeas corpus relief unless the state procedural rule is both *adequate* to support the state court judgment and *independent* of federal law.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-732, 735 (1991) (emphasis added).

For a state procedural rule to be "independent," the state law ground for decision must not be "interwoven with the federal law." <u>Park</u>, 202 F.3d at 1152, <u>quoting</u>, <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-1041 (1983).

Prior to 1998, <u>In re Harris's</u> "fundamental constitutional error" exception to the <u>Dixon</u> bar involved a consideration of federal law issues and was therefore "interwoven with the federal law." <u>See Reed</u>, 489 U.S. at 262-263.  However, the California Supreme Court determined in <u>In re Robbins</u> that the "fundamental constitutional error" exception would no longer involve federal law and would be considered exclusively by reference to state law.  <u>In re Robbins</u>, 18 Cal.4th at 811-812 & n. 32. Specifically, the Court in <u>Robbins</u> stated:

> [W]e shall, in this case and in the future, adopt the following approach as our standard practice: We need not and will not decide whether the alleged error actually constitutes a federal constitutional violation.  Instead, we shall assume, for the purpose of addressing the procedural issue, that a federal constitutional error is stated, and we shall find the exception inapposite if, based upon our application of state law, it cannot be said that the asserted error led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner.

<u>Id.</u> (emphasis added).

Therefore, whereas prior to <u>Robbins</u> a determination by a California court invoking the <u>Dixon</u> bar was necessarily interwoven with federal law and therefore not "independent" of state law, a determination *after* <u>Robbins</u> by a California court invoking the <u>Dixon</u> bar no longer involves federal law and is therefore "independent." <u>See Park</u>, 202 F.3d at 1152 ("The California Supreme Court has adopted in <u>Robbins</u> a stance from which it will now decline to consider federal law when deciding

1    whether claims are procedurally defaulted."); Id. at 1153 ("Robbins is clear . . . that its new approach

2    is prospective . . . .").

3        Robbins was decided on August 3, 1998. Robbins, 18 Cal.4th at 770. In this case,

4    Petitioner's state habeas petition was not filed in the Superior Court until September 25, 2002, and

5    the Superior Court denied the petition on October 4, 2002. (Doc. 18, Exh. G). Thus, the state court

6    decision was "post-Robbins," and therefore necessarily was independent of federal law. See Bennett

7    v. Mueller, 273 F.3d 895 (9th Cir.2001) (holding California's post-Robbins invocation of the

8    procedural default rule of untimeliness to be adequate and independent).

9        A state procedural rule on which the state relies to establish a procedural default must also

10   be "adequate." Coleman, 501 U.S. at 735. A state procedural rule is not adequate if, as applied, the

11   rule is arbitrary;[2] not clear, consistently applied or well-established;[3] or if compliance with the state

12   rule is so difficult that the rule is insufficiently hospitable to valid federal claims.[4]

13       Whether a procedural default rule is clear, consistently applied, or well-established must be

14   determined at the time of the petitioner's default. See Fields, 125 F.3d at 760; Bean, 96 F.3d at

15   1130. A default under In re Dixon for failure to raise a claim occurs at the point when petitioner had

16   the opportunity to raise the claim, i.e. the filing date of the Opening Brief in his appeal. Fields, 125

17   F.3d at 760. In this case, Petitioner filed his Opening Brief on appeal on April 14, 2000. (Doc. 18,

18   Exh. A). Thus, under the rationale of the Ninth Circuit in Fields, Petitioner's default occurred at that

19   time.

20       _____ The California Supreme Court stated in 1993 that "the application of its rules governing

21   habeas petitions had become irregular and inconsistent." Fields v. Calderon, 125 F.3d 757, 763 (9th

22   Cir. 1997), citing, In re Clark, 5 Cal.4th at 768. Because of this admission, the Ninth Circuit

23   determined that California's procedural bars were discretionary and not consistently applied before

24   1993. See Fields, 125 F.3d at 761-764 (California's rule on claims that should have been brought

---

26   [2]See, e.g., Dobbs v. Zant, 506 U.S. 357 (1993) (State's own error gave rise to the state procedural bar).

27   [3]See, e.g., Calderon v. United States Dist. Ct., 103 F.3d 72 (9th Cir.1996)

28   [4]See, e.g., Harmon v. Ryan, 959 F.2d 1457 (9th Cir.1992) (state procedures in practice at the time were so
ill-defined that petitioner could not reasonably have been expected to comply with state rule in question).

1  on appeal);  Bean, 96 F.3d at 1130 (California's rule on timeliness); Morales v. Calderon, 85 F.3d

2  1387, 1391 (9th Cir. 1995) (California's rule on timeliness);  Siripongs v. Calderon, 35 F.3d 1308,

3  1318 (9th Cir. 1994) (California's rule on successive petitions).

4       Because California's procedural bars had become ill-defined and imprecise over the years,

5  the California Supreme Court decided In re Clark and In re Harris in order to govern California

6  courts' exercise of discretion when applying, respectively, the Dixon default rule, and the

7  longstanding but unclear bar of "untimeliness" for recently discovered claims not apparent from the

8  record. Park, 202 F.3d at 1151-1152.  These California Supreme Court decisions "re-establish[ed]

9  California's procedural rules governing state habeas petitions and clearly define[d] and limit[ed] the

10 applicable exceptions." Park, 202 F.3d at 1152, quoting, Fields, 125 F.3d at 763-64.  Since that time,

11 the California Supreme Court has clearly, regularly, and consistently applied its established rules

12 governing procedural default.   See Bennett v. Mueller, 273 F.3d 895 (9th Cir.2001) (holding

13 California's post-Robbins invocation of the procedural default rule of untimeliness to be adequate

14 and independent).  Since Petitioner's Opening Brief was filed on April 14, 2000, some twenty

15 months after Robbins was decided, the Dixon bar is therefore an adequate state procedural rule.

**2.  Unambiguous State Court Reliance On Procedural Default.**

17      Even if the state grounds for the asserted defaults are adequate and independent, the

18 procedural default doctrine will not apply if "the last state court rendering a judgment in the case"

19 reached the merits of the claims.  Harris v. Reed, 489 U.S. 255, 262 (1989).  Considerations of

20 comity and federalism, which would ordinarily preclude federal review of procedurally defaulted

21 claims, do not apply if a state court decides a constitutional question even though it does not have

22 to.  Horsley v. Alabama, 45 F.3d 1486, 1489-1490 (11th Cir.), cert. denied, 516 U.S. 960 (1995).

23      In this case, the California Supreme Court never reached the merits of the case.  Rather, the

24 California Supreme Court issued a "silent denial" on July 14, 2004.  (Doc. 18, Exh. M).  By its

25 "silent order" denying review of the Superior Court's decision, the California Supreme Court is

26 presumed to have denied the claims presented for the same reasons stated in the opinion of the

27 Superior Court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  As the last state court rendering

28 a judgment, the Superior Court denied the petition unambiguously on state law procedural grounds.

Because the judgment plainly relies on state law and on state law alone, the procedural default doctrine is not precluded.

### 3. **The Cause and Prejudice Exception**.

If the state has asserted the procedural default doctrine in a timely and proper fashion, and if the default provides an adequate and independent state procedural ground for decision, the petitioner is barred from raising the defaulted claims unless he can 1) excuse the default by demonstrating *cause* for the default and actual *prejudice* as a result, *or* 2) show that the case falls within the category of cases the Supreme Court has characterized as <u>fundamental miscarriages of justice</u>. <u>Harris</u>, 489 U.S. at 262; <u>Coleman</u>, 501 U.S. at 750.

The Supreme Court has stated that cause exists if the prisoner can show that some objective factor external to the defense impeded efforts to comply with the State's procedural rules. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986); <u>accord</u> <u>Coleman</u>, 501 U.S. at 752-753; <u>see</u> <u>McCleskey v. Zant</u>, 499 U.S. 467, 493 (1991). The notions of "objective factors" and "external impediments" encompass a broad range of scenarios. <u>Coleman</u>, 501 U.S. at 753.

In this case, Petitioner has not demonstrated "cause" for the default. Likewise, petitioner presents no argument showing actual prejudice for purposes of the procedural default doctrine. Indeed, in his traverse, Petitioner simply iterates that he could not have discovered the factual predicate for his claims during the appeal process and that the appellate record was complex. Such conclusory arguments are, however, insufficient to avoid procedural default.

Finally, a petitioner who has committed a procedural default may be excused from the default and obtain federal review if he can demonstrate that failure to consider the claims will result in a "fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750; <u>see also</u> <u>Murray</u>, 477 U.S. at 495, <u>quoting</u>, <u>Engle v. Isaac</u>, 456 U.S. 107, 135 (1982) ("[T]he principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'").

The Supreme Court has yet to provide a definitive interpretation of the term "fundamental miscarriage of justice." However, the Court has made it clear that a fundamental miscarriage of justice exists when one alleges "actual innocence." <u>Herrera v. Collins</u>, 506 U.S. 390 (1993); <u>Schlup</u>

1  v. Delo, 513 U.S. 298 (1995); Murray, 477 U.S. at 496 ("[I]n an extraordinary case, where a

2  constitutional violation has probably resulted in the conviction of one who is actually innocent, a

3  federal habeas court may grant the writ even in the absence of a showing of cause for the procedural

4  default").  Petitioner must "show a fair probability that, in light of all the evidence, including that

5  alleged to have been illegally admitted (but with due regard for the unreliability of it) and evidence

6  tenably claimed to have been wrongly excluded or to have become available only after the trial, the

7  trier of fact would have entertained a reasonable doubt of his guilt."  Sawyer v. Whitley, 505 U.S.

8  333, 339 & n. 5 (1992).  However, the district court must "bear in mind that the exception for 'actual

9  innocence' is a very narrow exception." Id. at 341.  "A prototypical example of 'actual innocence'.

10  . . is the case where the State has convicted the wrong person of the crime. . . . [I]n rare instances it

11  may turn out later, for example, that another person has credibly confessed to the crime, and it is

12  evident that the law has made a mistake." Id. at 340.

13      In this case, Petitioner does contend that he is actually innocent of the crime for which he was

14  convicted and that another individual, Roger Santillan, committed the crime for which he was found

15  guilty.  However, on closer examination, Petitioner's claims simply repeat the same contentions he

16  has raised since the state court trial itself.  Taken together, Petitioner's evidence of factual innocence

17  does not create a "fair probability that, in light of all the evidence, ... the trier of fact would have

18  entertained a reasonable doubt of his guilt."  Sawyer, 505 U.S. at 339 & n. 5.  Thus, Petitioner's

19  claims do not rise to the level of a "fundamental miscarriage of justice" sufficient to excuse the

20  absence of cause for the default.

21      Therefore, this Court finds that Respondent has timely raised the procedural default doctrine,

22  and Petitioner's claims in Ground One are procedurally barred.  However, even assuming, arguendo,

23  that these claims were not procedurally barred, they must nevertheless be denied on their merits.

24      **B. Ground One Should Be Denied On The Merits.**[5]

25  _____

26      [5]Because the claims in Ground One were not raised in Petitioner's direct appeal and were procedurally
   barred in Petitioner's state habeas petitions, no reasoned state court decision exists with regard to these claims.
27  When presented with such a situation, the Court follows the Ninth Circuit's instructions in Delgado v. Lewis, 181
   F.3d 1087, 1091 (9th Cir.1999), remanded on other grounds in Lewis v. Delgado, 528 U.S. 1133 (2000):

28
      Unfortunately, when a state court does not articulate the rationale for its determination,
      a review of that court's "application" of clearly established federal law is not possible.

A.  The Photographic Lineup.

Petitioner contends that the "six pack" of photographs used by Detective Grove and shown to Sneed were unduly suggestive and gave rise to a "substantial likelihood" that Petitioner is factually innocent, based on the darkness in Sneed's apartment, her lack of opportunity to observe the intruder, the accuracy of Sneed's description based on cross-racial identification, the uncertainty of the victim's identification at trial, and the length of time between the crime and the photographic identification.  (Doc. 9, p. 2; pp. 25-27).  This contention has no merit.

It is clear that a defendant has a due process right not to be identified prior to trial in a manner that is "unnecessarily suggestive and conducive to irreparable mistaken identification."  Stovall v. Denno, 388 U.S. 293, 301-302 (1967), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314, 326 (1987).  The United States Supreme Court has adopted a "totality of the circumstances" test to be used in the analysis of identification testimony.  Manson v. Brathwaite, 432 U.S. 98, 114 (1977).  Identification testimony, even if flawed by improper police behavior, remains admissible if it appears reliable.  Id..  Thus, an unnecessarily suggestive identification is not subject to a "per se" exclusion.  Id.

The constitutionality of an identification is a mixed question of law and fact not governed by the statutory presumption of section 2254(d).  See Sumner v. Mata, 455 U.S. 591, 596 (1982).  In deciding this question, the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard.  The questions of fact that underlie this ultimate conclusion, however, *are* governed by the statutory presumption of correctness of state court fact findings.  28 U.S.C. § 2254(d).  Id.  Thus, whether a witness had the opportunity to observe the crime or gave a detailed description are questions of fact to which the presumption

---

[Footnote omitted]. See Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir.), cert. denied, 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998).  Thus, when confronted with a state court decision that does not provide the basis of its decision, we must determine whether, in light of an independent review of the record and the relevant federal law, the state court's resolution of a petitioner's claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." [Footnote omitted] 28 U.S.C.A. § 2254(d)(1).

Therefore, in the instant case, this Court will determine whether the state court's rejection of Petitioner's claims was "contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." 28 U.S.C. § 2254(d)(1).

1  applies. Id.   Here, the trial court made findings regarding Sneed's identification of Petitioner,

2  finding that her identification was "adamant" and "positive" based on the lighting, her opportunity

3  to observe, and Sneed's own certainty. (RT 8).  The Court must therefore defer to the state's court's

4  findings regarding Sneed's identification.

5      The threshold question, however, for the Court is whether the photographic lineup presented

6  by Grove to Sneed was impermissibly suggestive.  Manson v. Brathwaite, 432 U.S. at 114.

7  However, even if flawed by improper police behavior, identification testimony remains admissible

8  if it appears reliable.  Id.; see also Neil v. Biggers, 409 U.S. 188, 199 (1972); Simmons v. United

9  States, 390 U.S. 377, 384 (1968); Stovall v. Denno, 388 U.S. at 302.

10     Here, Petitioner has provided no basis for concluding that the photographic lineup was

11 unnecessarily suggestive.  Petitioner points to nothing in the lineup itself that would have suggested

12 to Sneed that Petitioner was the perpetrator.  Instead, Petitioner contends that Grove never "showed

13 the victim a photo of Mr. Santillan, the person Petitioner maintains was the actual burglar." (Doc.

14 9, p. 25). Presumably, Petitioner would have had Grove include Santillan's photograph in the lineup

15 or possibly conduct a separate photographic lineup that included Santillan.  Neither of these

16 scenarios, however, in any way impugns the legitimacy of the photographic lineup that was presented

17 to Sneed.  The Court will not simply speculate about whether and under what circumstances the

18 lineup could have been improved; the issue is not whether the lineup given to Sneed was the best

19 possible lineup under the circumstances, but whether it fell below the constitutional threshold set out

20 in Stovall, Manson, and Biggers.  Since nothing in the record indicates that it did, the Court cannot

21 conclude that the lineup was unduly suggestive.

22     Moreover, the Court need not even examine the issue of suggestiveness because, even

23 assuming arguendo that Petitioner's allegation is true and the identification was impermissibly

24 suggestive, the Court is convinced that Sneed's testimony is reliable and therefore, admissible.

25     The factors to be considered when assessing whether an identification was reliable are: (1)

26 the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of

27 attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty

28 ///

1  demonstrated by the witness at the confrontation, and (5) the length of time between the crime and

2  confrontation.  Neil v. Biggers, 409 U.S. at 199-200.

3       Here, Sneed had ample opportunity to view Petitioner in her bedroom, during daylight, under

4  reasonable lighting conditions.  She not only saw Petitioner at a distance of approximately three feet,

5  but talked to him as well.  Thereafter, she watched him from outside her apartment as he went to his

6  car.  A few hours later, when Sneed made her identification of Petitioner's photograph, she began

7  to sob and scream, telling Grove she was "150 percent" sure Petitioner was the burglar.  At trial,

8  Petitioner had some difficulty seeing Petitioner from the witness stand, but on closer observation

9  identified him.  It does not appear that Petitioner's trial counsel ever raised an objection to the

10  adequacy of the photographic lineup at trial.

11       From the foregoing, the Court concludes that Sneed's testimony was reliable and that the

12  lineup itself was not unduly suggestive simply because Sneed was not shown a photographic of

13  another suspect.  Accordingly, this claim fails.

14       B.  Destruction of Sales Receipts.

15       Petitioner next contends that police investigators committed perjury and obstruction of justice

16  by destroying sales receipts that would have substantiated Petitioner's claim that he was someplace

17  else at the time of the crime.  (Doc. 9, p. 27).  This contention, too, lacks merit.

18       At trial, Felicia Quintero, Petitioner's girlfriend, testified that Petitioner had gone out earlier

19  in the morning but returned around 10:45 when Quintero had awoken.  (RT 950).  Petitioner took

20  care of Quintero's daughter while Quintero took a shower.  (Id.)  Although Quintero normally tried

21  to get her daughter to school by 11:30, the three were running late and did not get out of the

22  apartment until 11:25.  (RT 952).  There was no parking in front of the school, so Quintero took her

23  daughter into school while Petitioner waited in the car.  (RT 953).  Quintero returned to the car five

24  to ten minutes later whereupon she and Petitioner went to Von's for groceries.  (RT 955).

25       At that point in Quintero's testimony, defense counsel sought to refresh her recollection by

26  showing her copies of sales receipts, to which the prosecution objected under the "best evidence"

27  rule.  (RT 955).  The court took the matter under submission and allowed the defense examination

28  to continue.  (RT 956).

1   Quintero testified that she had given the original Von's receipt to Petitioner's brother, who

2   had in turn given it to police the day after Petitioner was arrested. (RT 957). Quintero testified that

3   after going to Von's, she and Petitioner went to Save Mart, then McDonald's, then a 7 Eleven store,

4   and then finally to Napa Auto Parts. (RT 957-958). When the defense sought to show a receipt from

5   Napa to Quintero, the prosecution again objected on "best evidence" grounds. (RT 958). The court

6   again reserved its ruling. (Id.).

7   After Quintero's testimony, the court heard argument from counsel regarding the issue. The

8   court first noted that the photocopy of the Von's receipt showed a time and date of 12:18 p.m.,

9   December 9, 1998, and the Napa receipt showed a time and date of 12:42 p.m., December 9, 1998.

10  (RT 1050). Defense counsel argued that the "best evidence" rule should not exclude the receipts

11  because the originals had been given to police who had apparently lost or misplaced them. (RT

12  1051). The prosecution argued, and the trial court agreed, that nothing connected Petitioner to the

13  receipts and therefore they should be excluded. (Id.). However, regarding the prosecutor's earlier

14  objection and request to strike Quintero's testimony, the court permitted the testimony to remain and

15  considered the use of the receipts as proper "refreshment" of Quintero's recollection. (RT 1052).

16  In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression

17  by the prosecution of evidence favorable to an accused upon request violates due process where the

18  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

19  prosecution." See also Strickler v. Greene, 527 U.S. 263, 280-281 (1999). The Supreme Court has

20  stated that the duty to disclose such evidence is applicable even though there has been no request by

21  the accused. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty to disclose encompasses

22  impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676

23  (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been

24  disclosed to the defense, the result of the proceeding would have been different." Id., at 682; see also

25  Kyles v. Whitley, 514 U.S. 419, 433-434 (1995). Additionally, "the rule encompasses evidence

26  'known only to police investigators and not to the prosecutor.'" Strickler, 527 U.S. at 280, quoting

27  Kyles, 514 U.S. at 438. To constitute a Brady violation, the Supreme Court has set forth a three-part

28  test:

18

1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; 2) "[T]hat evidence must have been suppressed by the State, either willfully or inadvertently"; and 3) "[P]rejudice must have ensued." <u>Strickler</u>, 527 U.S. at 218-282.

Moreover, absent bad faith in the destruction of evidence, a claim of destroyed evidence cannot establish a denial of due process. <u>Arizona v. Youngblood</u>, 488 U.S. 51, 56 (1988); <u>Leavitt v. Arave</u>, 371 F.3d 663, 684 (9th Cir. 2004), <u>opinion amended on other grounds in</u> <u>Leavitt v. Arave</u>, 383 F.3d 809 (9th Cir. 2004).  In <u>Illinois v. Fisher</u>, 540 U.S. 544, 547-548 (2004), the Supreme Court distinguished between <u>Brady</u>, where "the good or bad faith of the prosecution is irrelevant," and <u>Youngblood</u> as follows:

> In <u>Youngblood</u>, by contrast [to <u>Brady</u>], we recognized that the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the result of which might have exonerated the defendant." 488 U.S. at 57, 109 S.Ct. 333.  We concluded that the failure to preserve this "potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police."

<u>Fisher</u>, 540 U.S. at 547-548.

Here, apart from Petitioner's own self-serving speculation, there is no evidence whatever that agents of the State intentionally or in bad faith destroyed the original receipts from Von's and Napa Auto Parts.  Quintero testified that she believed she gave the receipts to Petitioner's brother; however, there the trail ends in speculation and surmise.  Petitioner's brother did not testify and no police witness had knowledge of the receipts, although the copies obtained by the defense were found in a police document.  Thus, no evidence suggests, much less establishes, bad faith on the part of the police.  Accordingly, Petitioner's due process rights were not violated.  <u>Youngblood</u>, 488 U.S. at 56.

Moreover, even if bad faith could be established, the Court agrees with Respondent's contention that any error would be harmless under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) ("A federal court may grant habeas relief based on trial error only when that error had substantial and injurious effect or influence in determining the jury's verdict."); <u>Calderon v. Coleman</u>, 525 U.S. 141, 119 S.Ct. 500 (1998).  The United States Supreme Court has held that the appropriate standard on

///

///

1  collateral review for trial errors such as that asserted in Ground One is whether the error resulted in

2  "actual prejudice."  Brecht, 507 U.S. at 622- 623, 638.

3  _____Here, the receipts, even if introduced at trial and believed by the jury, would only have

4  established Petitioner's alibi from 12:18 p.m. forward.  Sneed had already called 911 by 11:30 a.m.,

5  after already going to the manager's office and then a friend's apartment.  The defense's own

6  investigator, Stebens, testified that he drove from Sneed's apartment to Petitioner's, a distance of

7  2.7 miles, and that it took him a minimum of five and three-quarter minutes and a maximum of eight

8  and one-quarter minutes.  (RT 1035).  Thus, assuming Petitioner left Sneed's apartment a few

9  minutes before her 911 call at 11:30, Petitioner could easily have driven home and been with

10  Quintero at or near the time that she testified that she, Petitioner, and her daughter left for school.

11  In other words, the receipts provide no proof that Petitioner could not have committed the burglary.

12  They merely corroborate Quintero's testimony about the couple's activities an hour after the burglary

13  was reported.  And since Quintero was allowed to use the receipts to give her testimony, the fact that

14  the jury did not get to see the receipts themselves could not have prejudiced Petitioner by making

15  it more likely the jurors would believe his alibi.  Accordingly, no "actual prejudice" occurred by the

16  purported destruction of the original receipts and the trial court's exclusion of the photocopies as

17  exhibits at trial.  Brecht, 507 U.S. at 622- 623, 638.

18  _____C.  Testimony of Hope Chacon.

19  Petitioner suggests that the police fabricated the supplemental police report from Detective

20  Grove that reported a telephone conversation between Chacon and Grove on the day of the burglary

21  in which Chacon told Grove that she had not seen Petitioner at the elementary school that morning.

22  (Doc. 9, p. 5).  There is no basis to this allegation.

23  "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair,

24  and must be set aside if there is any reasonable likelihood that the false testimony could have

25  affected the judgment of the jury."  United States v. Bagley, 473 U.S. at 678, quoting Agurs, 427

26  U.S. at 103.  In Napue v. Illinois, 360 U.S. 264 (1959), the Supreme Court found a due process

27  violation where the prosecution had failed to correct the record when its principal witness testified

28  that there was no promise of leniency:

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false evidence goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

Id. at 269.

Thus, the test for falsified or perjured evidence is (1) whether the evidence was known to be false, and (2) whether there is a reasonable likelihood that the false testimony could have affected the verdict. Grigsby v. Blodgett, 130 F.3d 365, 368 (9th Cir. 1997). Petitioner has met neither prong of the test.

Petitioner has presented nothing but unsubstantiated innuendo to support his claim that Grove knowingly falsified the report. Moreover, even if the report were false, Petitioner has not shown that the report affected the verdict. Indeed, there is nothing in the record to suggest that the report was ever used at trial other than being mentioned in one in camera hearing. Grove was not questioned about the report during her testimony, and neither Quintero nor Chacon were impeached with it when they testified that they had talked to police at the beginning of the case but the police never returned the calls. To the contrary, Chacon testified that she did not know Detective Grove, and, during closing argument, defense counsel characterized the evidence that Quintero and Chacon had actually provided the alibi information to Fresno Police officials at the outset of the case as "unchallenged." (RT 1106-1107).

From the foregoing, there was no proof of falsified evidence and no proof of prejudice to Petitioner. Accordingly, the error, if any, was not contrary to clearly established federal law.

D. Withholding Exculpatory Evidence Regarding Santillan.

Petitioner next contends that the State withheld evidence of another suspect, Roger Santillan, who, Petitioner maintains, committed the Sneed burglary. (Doc. 9, p. 25). This contention has no basis whatever.

As discussed previously, to constitute a Brady violation, three factors must be established: (1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "[T]hat evidence must have been suppressed by the State, either

///

willfully or inadvertently"; and (3) "[P]rejudice must have ensued." <u>Strickler</u>, 527 U.S. at 218-282.

Petitioner, contrary to his assertions, has established none of these factors.  First, the evidence concerning Santillan was not exculpatory.   The only evidence in the state court record itself regarding Santillan came at the preliminary hearing, when defense counsel asked Detective Grove if Roger Santillan looked like Petitioner.  (CT 51).  The detective indicated that in her opinion he did not.  (<u>Id.</u>).  Grove also testified that Santillan was not arrested for committing offenses similar to the Sneed burglary and that the cases were "completely different."  (<u>Id.</u>).  In a declaration, Grove also indicated that the modus operandi used by Petitioner and Santillan were different; Santillan usually pried back or smashed sliding glass doors while Petitioner preferred to use an ice pick or similar object to "go in behind the dead bolt and break the locking mechanism."  (Doc. 9, Exh. 13).  Moreover, Santillan usually worked with two or three additional individuals when he committed burglaries while Petitioner appeared to work alone.  (<u>Id.</u>).  Grove indicated that after Petitioner was arrested, no further burglaries occurred with his distinctive "MO," even though Santillan was not arrested for another two months.  (<u>Id.</u>).

In an effort to show that evidence relating to Santillan was exculpatory, Petitioner has attached to his petition photographs purporting to be of himself and Roger Santillan.  (Doc. 9, Exh. A).  Petitioner has also appended a declaration from defense counsel, who indicated that counsel's investigator was directed by counsel to develop information regarding Santillan's possible third-party culpability, that he recalled that Santillan "looks strikingly similar to defendant," and that he requested that the State provide information concerning Santillan. (<u>Id.</u>).  However, despite defense counsel's characterization of the similarity between Santillan and Petitioner, Detective Grove stated that "I can state without any hesitation that Anthony Elizaldi could be distinguished from Roger Santillan.  Although the two men resemble each other in booking photos, they were very different in their stature, methods of operation, and the areas in which they burglarized."  (Doc. 9, Exh. 13, p. 2).

From the preceding, it is obvious that evidence relating to Santillan would not have been exculpatory in nature.  Nor was it "suppressed" by the State; rather, as is discussed in depth in Ground 2D <u>infra</u>, the prosecutor moved in limine to exclude evidence of "third-party culpability",

i.e., Santillan, unless the defense first made an acceptable offer of proof to the court. (CT 161.) The trial court granted the motion after applying the correct state law standard. (RT 643.) Thus, the State did not "suppress" the Santillan evidence; rather, the trial court excluded it unless the defense could provide sufficient evidence to show that Santillan had some actual connection to the Sneed burglary. As is discussed in Ground 2D infra, the defense made no such showing. There can be no Brady violation when the evidence is excluded from the jury's consideration by a trial court correctly applying established state evidentiary rules.

Finally, the lack of prejudice is patent. Obviously, if the Santillan "evidence" is not exculpatory, its exclusion could not possibly have prejudiced Petitioner. Since none of the three factors needed to show a Brady violation have been established, the conduct of the prosecution in not going forward with the Santillan evidence at trial is not a violation of clearly established federal law. Strickler, 527 U.S. at 218-282.

E.  Prosecutorial Misconduct in Closing Argument.

Petitioner next contends that the prosecutor "impermissibly identified" Petitioner as the burglar during trial and that she "coached" Sneed when the victim's identification of Petitioner was not conclusive. (Doc. 9, p. 31). Both of these contentions are groundless.

To constitute a due process violation, prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987), quoting Bagley, 473 U.S. 667. In reviewing the prosecutor's remarks, the relevant question is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974). "It is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181.

Both attorneys are allowed reasonably wide latitude in making their closing arguments. Improprieties are not reversible error unless they are so gross as to probably prejudice the defendant, and the prejudice is not neutralized by the trial judge. U.S. v. Lester, 749 F.2d 1288, 1301 (9th Cir. 1984). During closing argument, the prosecutor has wide latitude, including the freedom to argue reasonable inferences based on the evidence. United States v. Molina, 934 F.2d 1440, 1445 (9th

Cir.1991).  The prosecutor is "allowed to strike hard blows based upon the testimony and its inferences." United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir.1972).  For example, the use of epithets such as "fraud," "scavenger," "parasite," and "professional con-man" have been upheld. United States v. Taxe, 540 F.2d 961, 968 (9th Cir. 1976); see also United States v. Bracy, 67 F.3d 1421, 1431 (9th Cir. 1995)(upholding statement that accused was "imminent source of evil in this courtroom--at this moment").

Furthermore, any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.  Greer, 483 U.S. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982).

Here, the portion of the transcript to which Petitioner refers in this claim merely indicates that the prosecutor attempted to use a photograph of Sneed's bedroom to have Sneed testify to where she had first seen Petitioner when he came in the apartment.  (RT 735-736).  Petitioner apparently believes that the prosecutor cannot refer to him as the perpetrator, even after he has been identified as such by the victim, during examination of the victim at trial.  The first defense objection was granted because the question, as framed, assumed facts not in evidence.[6]  The second objection, to the same question rephrased not to be leading, was overruled, the judge noting for the record that Sneed had pointed to a particular place in the photograph.

Once evidence was in the record that Sneed had identified Petitioner, it was appropriate for the prosecutor, in framing questions, to refer to Petitioner as the burglar, rather than referring to some abstract and unidentified "someone."   During closing argument, the prosecutor carefully reviewed the evidence of guilt without once referring to Petitioner as a burglar.  In her rebuttal closing argument, the prosecutor does refer to Petitioner as a "coward" for entering Sneed's apartment.  (RT 1115).  However, even such a characterization falls far short of establishing a due

---

[6]Initially, the prosecutor asked Sneed if Petitioner "was standing in front of this?"  (RT 735).  Since Sneed had yet to testify as to where Petitioner had been standing, the question was leading and indeed assumed a fact not in evidence, i.e., that Petitioner had been standing at a particular location depicted in the photograph.

process violation.  See Darden, 477 U.S. at 181-182 (no misconduct when prosecutor refers to accused as "animal"); Gorostiza, 468 F.2d at 916;  Taxe, 540 F.2d at 968; Bracy, 67 F.3d at 1431. The Court finds that no prosecutorial misconduct occurred in the use of a leading question by the prosecution or her references to Petitioner as the perpetrator of the Sneed burglary.  Were the standard for granting habeas relief so modest as that, few habeas petitions would ever be denied. The U.S. Supreme Court, however, requires that the challenged conduct have so infected the trial that it constituted a due process violation.  Darden, 477 U.S. at 181.  Clearly, that did not occur here.

Accordingly, the Court concludes that the prosecutor's comments did not violate Petitioner's due process rights and was not contrary to clearly established federal law.  Thus, this contention must be rejected.

F.  Harassment of a Witness.

Petitioner next argues that the prosecutor harassed Chacon during cross-examination of her at trial. (Doc. 9, p. 35).  Petitioner notes that his attorney was sustained on at least nine objections during Chacon's testimony, inferring from this that the prosecutor had committed misconduct. (Id.). Petitioner is mistaken.

During cross-examination, the prosecutor questioned Chacon closely about why she had waited for nine months to advise authorities that she could provide Petitioner with an alibi for the Sneed burglary. (RT 979-994).  On nine occasions defense counsel was successful in objecting to the prosecution's questions as being argumentative, speculative, or irrelevant.  On two occasions, defense counsel successfully moved to strike Chacon's answers.  (RT 990-998).  At no point, however, in the cross-examination did the prosecutor either call Chacon a liar or express a personal belief that she was not telling the truth.  Similarly, at no point did defense counsel ask to have the prosecutor admonished, to limit her cross-examination in this area, to instruct the jury regarding the improper questions, or to move for a mistrial.

Under all the circumstances, no misconduct occurred.  The prosecutor did continue to ask argumentative questions after objections to that line of questioning had been sustained.  However, neither the trial court nor defense counsel suggested that she abandon that line of questioning. Considering the critical importance of Chacon's testimony to both sides, and the significance of her

credibility to resolving the dispute in the evidence regarding Petitioner's alibi defense, the prosecutor was simply zealously representing the State's interest. When the prosecutor strayed too near the outer boundary of proper advocacy, the trial judge reigned her in by sustaining objections and striking answers. The judge also instructed the jury that comments of counsel are not evidence. Furthermore, these questions constituted but a few moments in a long, complicated trial. Cf. Hall v. Whitley, 935 F.2d 164, 165-166 (9th Cir. 1991)("Put in proper context, the comments were isolated moments in a three day trial."); Sassounian v. Roe, 230 F.3d 1097, 1107 (9th Cir. 2000)(comments were isolated events in long trial). In sum, these questions did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181. Nor can the Court conclude that, even if misconduct, the questions resulted in actual prejudice to Petitioner under the totality of the circumstances. Brecht, 507 U.S. at 622- 623, 638.

G. Prosecutorial Misconduct In Closing Argument.

Petitioner contends that the prosecution improperly misstated the evidence in closing argument. For example, Petitioner complains that the prosecutor highlighted the fact that employees at the elementary school did not see Petitioner, who was supposedly waiting in the car for Quintero to return, while not emphasizing the importance of seeing Quintero herself. (Doc. 9, p. 47). Respondent concedes that the prosecutor made several verbal misstatements, including, for example, stating that the time of the 911 call was 9:30 instead of 11:30, suggesting that the victim was wearing sunglasses rather than prescription glasses, and referring to the distance between the elementary school and Sneed's apartment as 3.2 minutes rather than 3.2 miles. (Doc. 18, pp. 23-25). Respondent contends, however, that the mistakes were inadvertent and would not have prejudiced Petitioner. (Id. at p. 25). The Court agrees with Respondent.

As mentioned, to establish prosecutorial misconduct, a petitioner must demonstrate that the prosecutor's closing "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181. Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably would have been different.

///

1    It bears emphasis, however, that "[i]mproper argument does not, per se, violate a defendant's

2    constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) quoting Jeffries v.

3    Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993).   Moreover, even if prosecutorial misconduct is

4    established, and even if it were constitutional error, the error cannot justify habeas relief if it fails

5    the Brecht harmless error test. See Thompson, 74 F.3d at 1577 ("Only if the argument were

6    constitutional error would we have to decide whether the constitutional error was harmless.").

7    Respondent concedes that the prosecutor misstated some evidence in her closing argument.

8    Nothing in the record of either her initial or rebuttal closing argument suggests that the prosecutor

9    was intentionally misstating the evidence or trying to mislead the jury.   To the contrary, in most

10   instances counsel either corrected herself or was corrected by the judge or defense counsel.   In any

11   event, the jury was instructed that statements of counsel made during trial are not evidence.

12   (CT 209).   The jurors heard the evidence independently of the lawyers and could use their own

13   recollection of the testimony to determine what the facts were.   Inadvertent verbal gaffes by the

14   prosecutor would not have affected the jurors' deliberations or the verdict.

15   As to the prosecutor's characterizations of the evidence and the inferences she urged the

16   jurors to draw, it is the prosecutor's duty to characterize the evidence in the light most favorable to

17   the government.  Likewise, it is, of course, the defense attorney's responsibility, not the prosecutor's,

18   to point out evidence that might raise a reasonable doubt in the minds of the jurors.   When the

19   prosecution characterizes the State's evidence in a favorable light that inculpates Petitioner, it

20   necessarily paints Petitioner in a negative light.   In so doing, the prosecutor is not violating

21   Petitioner's federal constitutional rights; she is simply doing her job.   Given the jury's instruction

22   regarding comments of counsel, the immediacy with which the verbal mistakes were corrected, the

23   jury's own independent recollection of the evidence, and defense counsel's failure to object to these

24   mistakes or request a mistrial, all strongly indicate that whatever prosecutorial errors occurred in

25   closing argument did not rise to the level of "misconduct" justifying federal habeas relief. Darden,

26   477 U.S. at 181. Moreover, even were it to rise to that level,  no "actual prejudice" has been

27   established from this record, and thus any error is harmless.   Brecht, 507 U.S. at 622- 623, 638.

28   ///

**Ground Two**   **The trial court abused its discretion in denying Petitioner's request for a pretrial lineup, prohibiting the defense from viewing the crime scene, instructing the jury with CALJIC 17.41.1, and denying admission of evidence of third-party culpability.**

Petitioner next contends that the trial court committed a series of errors during the trial that merit habeas relief. The Court will address each of these contentions individually, and finds them to be without merit.

## A. Petitioner's Request For A Pre-Trial Lineup.

Petitioner contends that the trial court erred in refusing a defense request for a pretrial lineup. Petitioner argues that the defense met the requirements in Evans v. Superior Court, 11 Cal.3d 617 (1974), that Evans does not require any particular showing as to the likelihood of misidentification, and that the test in Evans was, in any event, not "a terribly high standard." (Doc. 9, p. 50). Petitioner's contention is not well taken.

In that case, the trial court had denied a defense request for a pre-trial lineup, concluding that it lacked the authority to do so. The California Supreme Court held otherwise, basing its holding on the accused's right to pretrial discovery:

> There are no cases which hold as a matter of discovery in criminal matters that a trial court may order the granting of a defendant's request for pretrial lineup. It is indisputable, however, that when the People seek to deprive an accused of his liberty based on identification evidence such can only be done by procedures which accord to him due process of law. [Citations.] ...[T]he precise question now raised in not whether the People's affirmative evidence of identification is so impermissibly unfair that its receipt would infringe an accused's rights of due process. The question is whether prior to the in-court receipt of evidence of identification the accused can insist that procedures be afforded whereby the weakness of identification evidence, if it is in fact weak, can be disclosed. The question is thus not one of fairness in receiving evidence but rather one of fairness to an accused on pretrial discovery.

Evans, 11 Cal.3d at 621-622.

The California Supreme Court concluded that "due process required in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate." Id. at 622. However, the court went on to state that the right to such a pretrial lineup arises "only when eyewitness identification is shown to be a material issue *and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve*." Id. (Emphasis supplied).

1    Thus, the appropriate standard in this case is (1) whether eyewitness identification was a

2    material issue, and (2) whether there existed a reasonable likelihood of a mistaken identification

3    which a lineup would tend to resolve.  Id.  The former is certainly true.  The latter, however, is not.

4    At trial, the defense argued that the prosecution's case was "weak" because no evidence other

5    than Sneed's eyewitness identification tied Petitioner to the crime.  (RT 5).  The defense argued that

6    the combination of a weak identification and a strong alibi justified a pretrial lineup.  (Id.).  The

7    prosecution argued that the defense had not established that there was a reasonable likelihood that

8    the eyewitness identification was mistaken.  (Id.).  In denying the defense request, the trial court

9    found that eyewitness identification was clearly a material issue but that the second prong of Evans

10    had not been met.  (RT 8).  The trial court specifically relied on the circumstances of the

11    identification–that Sneed saw Petitioner in her bedroom, talked to him for a few moments, followed

12    him outside, and watched him get into a car, and then was able to positively identify Petitioner in

13    a lineup and pick his car out of hundreds in a parking lot.  (RT 9).

14    Such an adjudication was neither contrary to nor an unreasonable application of clearly

15    established federal law.  First, the Court notes that it has been unable to find any United States

16    Supreme Court precedent interpreting the Constitution to confer a right to a pretrial lineup on an

17    accused.  Certainly, a suspect pretrial identification procedure raises constitutional questions in and

18    of itself, e.g., Wright v. West, 505 U.S. 277 (1992), and any pretrial lineup is a "critical stage" of the

19    criminal process requiring the presence of an accused's attorney, Schneckloth v. Bustamonte,

20    412 U.S. 218 (1973).  However, the Court can find no "clearly established federal law" entitling

21    Petitioner to a pretrial lineup.  Accordingly, the state court's decision cannot be contrary to or an

22    unreasonable application of clearly established federal law.

23    Moreover, it does not appear that the trial court misapplied California law as set forth in

24    Evans.  As mentioned, Sneed had ample opportunity to view Petitioner at close range during

25    daytime in a room that was bright enough that Sneed needed to cover her head with blankets in order

26    to sleep.  She talked to Petitioner for several moments before ordering him out of her house, and

27    then she watched him leave.  Later, when she identified Petitioner in a photographic lineup, she

28    broke down and began screaming.  She indicated she was "150 percent" positive in her

29

identification.  Finally, she was able to pick out Petitioner's car from a large number of vehicles in a public parking lot containing many similar vehicles.

All of these circumstances support the trial court's conclusion that Sneed's identification was "adamant" and "positive."  (RT 8).  Moreover, Petitioner's repeated assertions that there was a "real potential for mistaken identification" is based in large part upon his speculation regarding Santillan and his possible role in the Sneed burglary.  However, Detective Grove, in her testimony at the preliminary hearing, rejected the notion that Santillan and Petitioner were similar in physical appearance, and her declaration makes it clear that the two used dissimilar methods in their past burglaries.  Moreover, no evidence was ever adduced that linked Santillan with Sneed's burglary.  Accordingly, the trial court correctly applied Evans in denying the defense request for a pretrial lineup.

### B.  Petitioner's Request To View The Crime Scene.

Petitioner argues that the trial court erred in denying a defense motion to view the crime scene.  This contention is without merit.

Prior to trial, Petitioner's counsel requested an opportunity to view the crime scene in order to personally observe the lighting conditions in Sneed's apartment.  (RT 207).  The State objected, indicated that Sneed was so upset that she had begun sleeping in her hallway and that, in any event, the issue was for the jury, who might be given a tour of the premises, not for defense counsel, who already had photographs of the apartment.  (RT 208).  Initially, however, the trial court granted the defense motion for a one-half hour viewing.  (Id.).

Subsequently, the trial court reconsidered its ruling in light of Sneed's apparent reluctance to permit the defense into her apartment.  (RT 4).  The court indicated it was unsure it had the right to order Sneed, who was not before the court and had not appeared in court, to permit others inside her home, and thus the court's order to the prosecution to permit the viewing might not have "any force and effect."  (RT 5).   Defense counsel agreed that he was in a "quandary" over the matter and that it was "difficult for the Court to maybe order a private citizen to open up their doors to somebody."  (RT 7-8).  The trial court responded, "The person that I need to command to open up their door is the person who owns the home.  I think the Court has that inherent power under the case

1    that I indicated to you, but the problem is, is that [Sneed's] never been before me to make that

2    order." (RT 8).  The court then rescinded its earlier order granting the defense request, and left it to

3    the trial judge to decide as a final matter.  (Id.).  The court noted that it was not precluding the

4    defense from "ultimately get[ting] into the home, but the Court has to have before it the proper party

5    in which to order it."  (Id. at 9).

6        On direct appeal, Petitioner raised the issue in the 5th DCA, which rejected it because

7    Petitioner, by failing renew the motion before the trial court or to otherwise pursue the issue, had

8    waived it.  (Doc. 18, Exh. D, pp. 10-14).   Respondent now argues that Petitioner is procedurally

9    barred from raising this issue.  (Doc. 18, p. 27).  The Court agrees, but will nevertheless address the

10   merits of the issue and find them entirely lacking.

11       Evidentiary rulings are generally questions of state law which are not cognizable in federal

12   habeas proceedings.  Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("it is not the province of a federal

13   habeas court to reexamine state court determinations on state law questions"); Jammal v. Van de

14   Kamp, 926 F.2d 918, 919 (9th Cir 1991)(this court is "not a state supreme court of errors; [it does]

15   not review questions of state evidence law").   Here, Petitioner has not cited, and this Court has not

16   found, any "clearly established federal law" entitling Petitioner to a viewing of the crime scene.

17       Moreover, at trial Sneed's visual acuity was impeached.  Also, defense counsel raised

18   questions concerning how dark Sneed's bedroom was on the day of the burglary and whether she had

19   actually seen Petitioner through a peephole in her front door rather than outside her apartment.  (RT

20   708, 771, 776, 912).  Photographs of Sneed's bedroom and apartment were introduced; however, the

21   defense had ample opportunity to cross-examine Sneed about the photographs and to comment in

22   closing argument about them.  Indeed, defense counsel argued to the jury that Sneed's identification

23   of Petitioner was unreliable because of her poor eyesight, her emotional state immediately after the

24   incident, her use of a peephole rather than direct line-of-sight, and the lack of light in her bedroom.

25   (RT 1088-1099).

26       From all of these circumstances, Petitioner was not prejudiced by his inability to view the

27   crime scene and take pictures that could possibly present a different view of the apartment.

28   ///

1    Accordingly, there has been no due process violation; hence, the issue is not cognizable in these

2    habeas proceedings.

3        **C.  CALJIC No. 17.41.1.**

4        Petitioner next argues that his Sixth and Fourteenth Amendment rights were violated when

5    the trial court instructed the jury pursuant to CALJIC No. 17.41.1, which Petitioner alleges

6    improperly chilled the jury's deliberative process, permitted the judge to improperly assist the

7    majority in imposing its will on a minority of jurors, and infringed in the right of jury nullification.

8    (Doc. 18, p. 66.)  Petitioner is again mistaken.

9        At trial, the attorneys and court discussed in camera which instructions were to be given to

10   the jury.  At one point, the court indicated that a number of CALJIC instructions, including No.

11   17.41.1, would be given; there were no objections from either side.  (RT 1056-1065).

12       Generally, the issue of whether a jury instruction is a violation of state law is neither a federal

13   question nor a proper subject for habeas corpus relief. Estelle, 502 U.S. at 68 ("We have stated many

14   times that 'federal habeas corpus relief does not lie for errors of state law.' "); Gilmore v. Taylor, 508

15   U.S. 333, 348-349 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise

16   to the level of a constitutional violation, may not be corrected on federal habeas").  Thus, normally,

17   a claim that challenges the propriety of a jury instruction under state law cannot reasonably be

18   construed to allege a deprivation of federal rights. Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th  Cir.

19   1986).  Indeed, federal courts are bound by state court rulings on questions of state law. Oxborrow

20   v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942 (1989).

21       A challenge to a jury instruction solely as an error under state law does not normally state a

22   claim cognizable in a federal habeas corpus action. See Estelle, 502 U.S. at 71-72. To obtain federal

23   collateral relief for errors in the jury charge, the petitioner must show that the ailing instruction by

24   itself so infected the entire trial that the resulting conviction violates due process. See id. at 72.  The

25   constitutional significance of the omission of an instruction will depend upon the evidence in the

26   case and the overall instructions given to the jury.  See Duckett v. Godinez, 67 F.3d 734, 745 (9th

27   Cir. 1995); see also Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

28   ///

Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The Court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), citing Henderson v. Kibbe, 431 U.S. at 154. Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, the petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. Henderson v. Kibbe, 431 U.S. at 154.  Moreover, an individual such as Petitioner in this case whose claim involves the *omission* of an instruction "bears an especially heavy burden," because an omission is less likely to be prejudicial than a purported misstatement of the law. Id. at 155.

Under the foregoing authority, the Court must determine whether the challenged instruction was so egregious that the resulting conviction violates due process.  Kibbe, 431 U.S. at 154. Regarding the trial court's instruction on CALJIC 17.41.1., the jury was instructed as follows:

> The integrity of a trial requires that jurors, at all times during their
> deliberations, conduct themselves as required by these instructions.  Accordingly,
> should it occur that any juror refuses to deliberate or expresses an intention to
> disregard the law or to decide the case based on penalty or punishment, or any
> [other] improper basis, it is the obligation of the other jurors to immediately advise
> the Court of the situation.

(CT 257).

On direct appeal, Petitioner did not present this issue.  However, in his state habeas petition, he did.  In denying the petition, the Superior Court noted that People v. Engleman, 28 Cal.4th 436 (2002), contradicted Petitioner's position.  (Doc. 18, Exh. G, p. 2).

In Engleman, the California Supreme Court considered the same arguments raised by Petitioner and directed state trial courts not to give CALJIC No. 17.41.1 in the future, based on the

///

33

1  Court's concern that the instruction "has the potential to intrude unnecessarily on the deliberative
2  process and affect it adversely–both with respect to the freedom of jurors to express their differing
3  views during deliberations, and the proper receptivity they should accord the views of their fellow
4  jurors." Engleman, 28 Cal.4th at 440-441, 449.

5        Nevertheless, the Court held that the instruction did not violate the defendant's Sixth
6  Amendment right to a jury trial because the constitutional right does not require "absolute and
7  impenetrable secrecy for jury deliberations in the face of an allegation of juror misconduct," or
8  "constitute [ ] an absolute bar to jury instructions that might induce jurors to reveal some element
9  of their deliberations." Id. at 443.

10       As a preliminary matter, this Court notes that Petitioner has not cited, and the Court has been
11 unable to locate, any federal authority, let alone United States Supreme Court authority, holding that
12 CALJIC No. 17.41.1, or an instruction substantially similar to it, violates a defendant's federal
13 constitutional rights under the Sixth Amendment. Absent such a "clearly established" federal law,
14 the Court has no basis for either finding or concluding that the California courts' rejection of
15 Petitioner's claim either was contrary to or involved an unreasonable application of clearly
16 established Supreme Court law. 28 U.S.C. § 2254(d)(1); Brewer v. Hall, 378 F.3d 952, 955 (9th
17 Cir. 2004)(affirming denial of habeas petition based upon giving of CALJIC 17.41.1 because of
18 absence of Supreme Court precedent clearly establishing that the instruction is unconstitutional).

19       Assuming, arguendo, however, that the issue is cognizable in a federal habeas case, the
20 instruction, contrary to Petitioner's assertions, does not intrude on or interfere with the ability of each
21 juror to deliberate independently and reach their own verdict. The instruction does not, as Petitioner
22 contends (Doc. 9, p. 67), require that each word uttered in deliberations be reported or that
23 holdout jurors be singled out and reported to the trial judge. Rather, the instruction attempts to
24 ensure the proper functioning of the jury by enabling the trial court to investigate jury misconduct
25 when necessary. The instruction on its face does not misstate the law. A juror may not refuse to
26 deliberate, may not disregard the law, and may not decide the case by relying on an improper basis.

27       The contention that the instruction chills the "independent" deliberations of jurors by
28 forcing jurors to essentially police one another is both abstract and speculative. The instruction

1  only authorizes the jury to report a juror who is refusing to deliberate or follow instructions, not a

2  juror who is simply dissenting from the majority.  If jurors were to report a juror to the court simply

3  on the basis of dissenting, the jurors would not be following the instruction as written, as they are

4  presumed to do.  See Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997).

5        Moreover, the instruction contains no suggestion that jurors who disagree with other jurors

6  will be punished or suffer negative consequences.  While a reasonable juror might infer from the

7  instruction that the trial court would investigate any reports of misconduct, it would be unreasonable

8  for such jurors to also infer that the trial court would in some fashion mete out punishment to jurors

9  without first fully investigating such allegations to ensure that they were well-founded.

10        Petitioner's claim that the instruction deprived him of his right of jury nullification is equally

11  unavailing.  Jury nullification may be a reality in the courtroom, but it is not a right under the

12  Constitution, laws, or treaties of the United States.  See Crease v. McKune, 189 F.3d 1188, 1194

13  (10th Cir. 1999)(noting no right to jury nullification in the context of federal habeas review); cf.

14  United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992)(federal defendants are not entitled to

15  jury nullification instructions).[7]  Petitioner has not cited any Supreme Court authority for the

16  proposition that he has a federal constitutional right to jury nullification, much less to an instruction

17  to the jury itself that it may disregard the law in its deliberations.  Accordingly, there is not, in this

18  regard, any clearly established federal law for the state court's decision either to contradict or to

19  unreasonably apply.

20        In the absence of any such Supreme Court precedent, it cannot be maintained that the mere

21  giving of CALJIC No. 17.41.1 was a violation of "clearly established Federal law, as determined by

22  the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Brewer, 378 F.3d at 955.

23        In order to be entitled to federal habeas corpus relief, Petitioner must show that CALJIC

24  No. 17.41.1 by itself so infected the entire trial that the resulting conviction violated due process.

25  See Estelle, 502 U.S. at 72.  He has not done so, nor has he shown that there is a "reasonable

26  likelihood" that the jury applied the instruction in a manner that violated the Constitution.  See id.

27

28        [7]In California, jurors have the ability to nullify or disregard the court's instructions and evidence, and to
return a verdict contrary to the law and the evidence, but they have no right of nullification regarding the applicable
legal principles that govern their role as fact-finders.  People v. Williams, 25 Cal.4th 441, 454 (2001).

1    Moreover, even assuming that the challenged instruction did violate Petitioner's Sixth
2    Amendment rights as a matter of clearly established Supreme Court law, the Court has no basis for
3    concluding that the giving of the instruction had a substantial and injurious effect or influence in
4    determining the jury's verdict. See Brecht, 507 U.S. at 637.  Considered as a whole, the instructions
5    given to the jury accurately stated the law and advised the jurors that it was their duty to decide the
6    case based on their individual opinions.

7    Petitioner's allegations regarding the effect of the challenged instruction on jury deliberations
8    are unsupported by the record and conclusory.  Conclusory allegations do not warrant habeas relief.
9    See Jones v. Gomez, 66 F.3d 199, 204-205 (9th Cir.1995) (holding that conclusory allegations made
10   with no reference to the record or any document do not merit habeas relief).  Petitioner is unable to
11   demonstrate any act on the part of the jury that would suggest that the challenged instruction so
12   infected the entire trial that his conviction violates due process.  Indeed, there is no indication in this
13   record that any problems occurred that were even arguably attributable to the giving of CALJIC
14    No. 17.41.1, e.g., jury deadlock, conflicts regarding holdout jurors, refusal to follow the law, stifled
15   deliberations, or intrusion by the trial judge into the deliberative process.  Nor does Petitioner assert
16   that anything of this ilk occurred.

17   The state court resolution of this claim was not contrary to clearly established Federal law,
18   as determined by the Supreme Court of the United States, nor did the state court resolution result in
19   a decision that was based on an unreasonable determination of the facts in light of the evidence
20   presented. See 28 U.S.C. § 2254(d). Accordingly, this contention must be denied.

21   **D.  Evidence Of Third-Party Culpability**.

22   As discussed previously, prior to trial, the prosecution filed a motion in limine to preclude
23   the defense from raising at trial the issue of the third-party culpability of anyone without first making
24   an offer of proof to the court.  (CT 161.)  Before trial, the court heard the motion, indicated that the
25   prosecution's legal authorities and arguments were "well taken," and granted the motion.  (RT 643.)
26   Petitioner now maintains that the trial court erred in so ruling.  Petitioner is mistaken.

27   Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a
28   federal habeas corpus proceeding. Estelle, 502 U.S. at 67-68; Middleton v. Cupp, 768 F.2d 1083,

36

1085 (9th Cir.), <u>cert. denied</u>, 478 U.S. 1021 (1985).  A state court's ruling on evidence, even if erroneous, is grounds for habeas relief only if it renders the state court proceeding so fundamentally unfair as to violate due process.  <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962); <u>see</u> <u>Estelle</u>, 502 U.S. at 71-72; <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>Walters v. Maas</u>, 45 F.3d 1355, 1357 (9th Cir. 1995); <u>Jeffries v. Blodgett</u>, 5 F.3d at 1192; <u>Gordon v. Duran</u>, 895 F.2d 610, 613 (9th Cir.1990). However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  <u>Jammal</u>, 926 F.2d at 919-920.

The rights encompassed by the Sixth Amendment include the right to present relevant evidence.  <u>Michigan v. Lucas</u>, 500 U.S. 145 (1991).  A defendant has no right, however, to present irrelevant evidence.  <u>United States v. Torres</u>, 937 F.2d 1469, 1473 (9th Cir. 1991).  It is within the trial court's discretion to determine which issues are relevant.  <u>See</u> <u>id.</u>  Moreover, even relevant evidence can be excluded in certain circumstances.  <u>Wood v. Alaska</u>, 957 F.2d 1544, 1549 (9th Cir. 1992).  The right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295 (1973).

Here, the prosecution sought to exclude the elicitation by the defense of any evidence of third-party culpability without a prior offer of proof, pursuant to <u>People v. Hall</u>, 41 Cal.3d 826 (1986). (CT 161-163).  The trial court agreed with the State's authorities and granted the motion. (RT 643).  In so ruling, the court did not prohibit *all* evidence of third-party culpability *for all purposes*, nor did it even preclude the defense from asserting third-party culpability as a defense; rather, it simply precluded the defense from presenting such evidence to the jury without first making an offer of proof to the trial court.  Thus, the ruling by the state court simply placed a reasonable pre-condition on the introduction of any defense evidence regarding third-party culpability; it did *not* impose a blanket bar on all such evidence.

In <u>Hall</u>, the case relied upon by the State and by the trial court, the defendant was charged with and convicted of first degree murder and second degree robbery and burglary for the killing of Israel Deasonhouse, who was found on the kitchen floor of his home lying face-up, his clothing in

disarray, his pants pockets fully turned out. 41 Cal.3d at 829.  The coroner initially determined the cause of death was cardiac arrhythmia incident to heart disease.  Id.  On the basis of information volunteered by one Rhae Foust, authorities exhumed the victim's body and a further autopsy revealed that the victim had been strangled.  Id.  Foust also told police that defendant had confessed that he and another individual had strangled the victim, believing he had a large sum of money on him.  Id.

At trial, the defense attempted to show that the victim was killed by someone else, most likely a teenage neighbor who had caused the victim problems or by Foust himself.  The defense intended to base its theory on the fact that the victim's neck bone had been broken on the left side, that defendant was right-handed, that Foust's estranged wife would testify that he was left-handed, and that he was violent when drunk, and had a history as a police informant.  Id. at 830.  She would also testify that Foust had never mentioned a meeting with defendant and that he was a "pathological liar."  Id.  The trial court rejected the defense, concluding that the proffered testimony did not go beyond the point of "possible suspicion" that Foust was guilty.  Id.  Nevertheless, the defense presented much of this evidence to impeach Foust's credibility at trial.  Id.

The California Supreme Court held that the trial court had erred in excluding the evidence because the court had required the defense to make a preliminary showing of "substantial probability" that the third party actually committed the crime.  Id. at 833.  The proper test in California was "limited to whether this evidence could raise a reasonable doubt as to defendant's guilt."  Id.  The court was then required to apply California Evidence Code § 352 to determine whether the probative value of the evidence was substantially outweighed by its prejudicial effect.[8] The court summarized the test for admission of third-party culpability evidence as follows:

> "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.  As this court observed [previously], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: *there*

---

[8] Evidence Code § 352 provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, or confusing the issue, or of misleading the jury."

*must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime*."

Id. at 833.(Emphasis supplied).

The California Supreme Court went on to explain that "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion (§ 352)." Id. at 834. In so ruling, the California Supreme Court expressly rejected defendant's claim that his federal constitutional right to present a defense precludes any application of § 352 to third-party culpability evidence because even remote evidence of motive without more might raise a "reasonable doubt" of guilt:

> "The claim does not withstand scrutiny. As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice."

Id.[9] The California Supreme Court's holding is entirely consistent with the federal constitutional law set forth supra.

Although the Hall standard does not require proof beyond a reasonable doubt, or even a probability that the third-party is culpable, it does require that the defense proffer *some* direct or circumstantial evidence linking the third-party to the actual commission of the crime. Evans, 41 Cal.3d at 833. Here, as discussed above, the only evidence in this record that was ever presented came at the preliminary hearing, when defense counsel asked Detective Grove if Roger Santillan looked like Petitioner. (CT 51). The detective indicated that in her opinion he did not. (Id.). Petitioner has attached to his petition photographs purporting to be of himself and Roger Santillan. (Doc. 9, p. Exh. A). Petitioner has also appended a declaration from defense counsel, who indicated that counsel's investigator was directed by counsel to develop information regarding Santillan's possible third-party culpability, that he recalled that Santillan "looks strikingly similar to defendant," and that he requested that the State provide information concerning Santillan. However, despite this investigation into Santillan, the defense never made an offer of proof at trial concerning Santillan's

---

[9]Despite this ruling, the court held that the trial court's erroneous exclusion of the evidence was harmless because all of the pertinent evidence was presented to the jury anyway. Id. at 835-836.

possible third-party culpability, and when the trial court heard argument on the State's motion to exclude such evidence under <u>Hall</u>, the defense submitted without offering any evidence at all. (RT 643).

Thus, there was simply no direct or circumstantial evidence presented to the trial court linking Santillan to the actual perpetration of the Sneed burglary.  Accordingly, it appears that the state court properly applied California law as set out in <u>Hall</u>.  The question before this Court, however, is not to decide whether the state court correctly applied state law, but to determine whether the state court's ruling on the State's motion was contrary to or an unreasonable application of clearly established federal law.  It was not.

As mentioned, the trial court did not preclude Petitioner from raising this defense.  It merely followed California law in requiring Petitioner to first demonstrate that it had some evidence linking Santillan to the actual perpetration of the crime before the defense could proceed.  Unlike <u>Hall</u>, where the defendant presented various pieces of evidence to support its theory that Foust was the perpetrator, here the defense offered the trial court <u>no</u> direct or circumstantial evidence of Santillan's actual involvement in the Sneed burglary.

Under such circumstances, the state court's adjudication of this issue cannot be deemed a violation of federal due process.  Accordingly, the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law.

**Ground Three          Ineffective Assistance Of Trial Counsel.**

Petitioner next contends that he was denied the effective assistance of trial counsel in violation of his rights under the Sixth Amendment.  The Court concludes that this claim lacks merit.

**A.  <u>The Standard For Ineffective Assistance of Counsel</u>.**

In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Strickland</u>, 466 U.S. at 687.  To establish this, the petitioner must show that counsel's representation fell below an objective standard of

reasonableness.  Id. at 688.  The petitioner must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id.; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential, and a court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Second, petitioner must show prejudice, i.e., whether counsel's errors were so egregious as to deprive him of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688, 694. To establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

 A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; Williams v. Taylor, 529 U.S. 362, 391 (2000).   In so doing, the Court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345.

The Court does not need to consider the two elements in any particular order, nor does the Court need to consider both if the showing on either one is insufficient.  Strickland, 466 U.S. at 697. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Id.  The object of an ineffectiveness claim is not to grade counsel's performance.  Id.  "If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

With these principles in mind, the Court now turns to an analysis of Petitioner's claims of ineffective assistance of counsel.

**B.  Petitioner Was Not Denied The Effective Assistance Of Trial Counsel.**

Petitioner contends that his trial counsel provided ineffective assistance in failing to call an expert witness regarding the victim's identification of Petitioner, in failing to investigate "crimes committed by the guilty party," in the late disclosure of the alibi witness, Hope Chacon, and in

///

1 failing to investigate purported prosecutorial misconduct.  The Court will address each of these

2 claims individually.

3                      1. <u>Failure To Call Expert Witness</u>.

4        Petitioner contends that trial counsel performed ineffectively in failing to call expert

5 witnesses to show that the victim's eyesight was defective and to show the problems inherent in

6 cross-racial eyewitness identification.  (Doc. 9, p. 76).  These contentions lack merit.

7        At trial, the victim testified that she worked at night and slept during the day in a bedroom

8 that was bright enough that it would keep her awake if she did not cover her head with the blankets.

9 (RT 708).   She also testified that when she first saw Petitioner, he was standing three feet from her

10 near the head of the bed.  (RT 712).  From her testimony, it appears that although she later saw

11 Petitioner running to his car, her best opportunity to view Petitioner came in a fairly well-lit room

12 from approximately three feet.  Petitioner positively identified Petitioner in a photographic lineup

13 later that day.  (RT 841).   Indeed, Detective Grove testified that Sneed began crying and then

14 screaming when she saw Petitioner's photograph, which she pushed across the table to Grove,

15 saying "this is him."  (RT 841).

16        On cross-examination, defense counsel asked Sneed if she ever wore glasses but she said

17 "no," that she only used them for reading.  (RT 793).  Nevertheless, when asked to identify Petitioner

18 in the courtroom, Sneed could not see him well enough at counsel table to make the identification;

19 she had to have a closer look before indicating, "he looks like the guy."  (RT 716).

20        Petitioner's counsel declared under oath that his investigation did not indicate that the victim

21 wore glasses, a fact supported by the victim's own testimony, and that therefore he did not consider

22 calling an ophthalmologist expert witness.  (Doc. 9, Exh. 8, p. 3).  Also, counsel "chose not to use

23 an identification expert, believing that such testimony would not assist the jury, and that

24 identification expert opinion is within the purview of the average juror, particularly in light of

25 CALJIC 2.92.  (<u>Id.</u>).

26        At trial, the jury was instructed with CALJIC No. 2.92, which explains to jurors that they are

27 to assess the credibility of eyewitnesses by weighing their opportunity to witness the crime, the stress

28 they were under at the time, their ability to describe the events later, the extent to which the accused

fits the description given, the cross-racial nature of the identification, the witness's capacity to make an identification, whether the witness identified the suspect in a photographic lineup, the time span between the crime and the identification, whether the witness had prior contacts with the suspect, the certainty of the identification, and whether it is the product of the witness's own recollection. (CT 244-246).

Considering all of this evidence on the issue of eyewitness identification, it cannot be said that trial counsel's performance fell below an objective standard of reasonableness. Petitioner asserts that the victim's driver's license indicated she must drive with corrective lenses and that counsel's failure to call a vision expert "withdrew a meritorious defense." (Doc. 9, p. 76). However, Petitioner provides no independent evidence to support his claim that an expert witness would have testified at trial and would have been helpful to the defense. Petitioner did not identify the potential witness, U.S. v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985), or show that the witness was willing to testify, U.S. v. Harden, 846 F.2d 1229, 1231-1232 (9th Cir. 1988), or that the witness's testimony would have been sufficient to create a reasonable doubt as to guilt. Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990); see also United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1989)(holding that where defendant did not indicate what witness would have testified to and how such testimony would have changed the outcome of the trial, there can be no ineffective assistance of counsel). Considering that the crucial eyewitness identification resulted from Sneed seeing Petitioner at a range of three feet, in daytime, in a moderately well-lit room, it is mere speculation to suggest that an expert could have testified that Sneed's eyesight was so poor that even at three feet her identification would be suspect.

Moreover, the jury was fully aware of Sneed's lack of perfect vision at distance, having observed her inability to make a clear identification of Petitioner at trial until she took a closer look at him. The jury was properly instructed to consider all such factors in determining whether Sneed's identification of Petitioner was credible.

Finally, even assuming, arguendo, that counsel's performance was deficient, considering all of the circumstances mentioned above, Petitioner has not established prejudice. As mentioned, Petitioner did not identify an expert that would have testified at trial; rather, he merely speculated

43

that such an expert could have been found.  Such speculation is insufficient to establish prejudice.

See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001); see also Grigsby v. Blodgett,

130 F.3d at 373 (speculating as to what an expert would say is not sufficient to establish prejudice).

As mentioned, Sneed saw Petitioner at a range of three feet, made a solid identification of

him a few hours later in a photographic lineup, and was able to pick out his car from a parking lot

containing several hundred cars.  It is difficult to see how the absence of expert testimony about

either Sneed's eyesight or cross-racial identifications would have improved the outcome at trial for

Petitioner.  Accordingly, this claim fails.

## 2.  Failure To Investigate Third-Party Guilt.

Petitioner contends that his trial counsel rendered ineffective assistance by failing to pursue

a third-party culpability defense.  (Doc. 9, pp. 81-83).  This contention is also without merit.

Defense counsel has a "duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct.

2052. This includes a duty to investigate the defendant's "most important defense," Sanders,

21 F.3d at 1457, and a duty adequately to investigate and introduce into evidence records that

demonstrate factual innocence, or that raise sufficient doubt on that question to undermine

confidence in the verdict. Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir.1999).  However, "the duty

to investigate and prepare a defense is not limitless: it does not necessarily require that every

conceivable witness be interviewed." Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir.1995)

(citations and quotations omitted).  "A claim of failure to interview a witness...cannot establish

ineffective assistance when the person's account is otherwise fairly known to defense counsel."

Eggleston v. United States, 798 F.2d 374, 376 (9th Cir.1986) (citations and quotations omitted).

When the record clearly shows that the lawyer was well-informed, and the defendant fails to state

what additional information would be gained by the discovery she or he now claims was necessary,

an ineffective assistance claim fails. Id.  Furthermore, "ineffective assistance claims based on a

duty to investigate must be considered in light of the strength of the government's case." Id.

In his declaration supporting the petition, trial counsel stated that he had directed his

investigator to pursue the possibility of third-party culpability by Santillan, that Santillan looked

44

1    "strikingly similar to" Petitioner, that counsel sought discovery from the prosecutor about anything

2    related to Santillan, and that he did in fact "gather court history information regarding Mr. Santillan."

3    (Id., Exh. 8).  Moreover, as mentioned above, trial counsel attempted to cross-examine Detective

4    Grove regarding the physical similarities between the two men but she testified that they did not look

5    alike to her.  Also, trial counsel successfully moved for the exclusion of ten other burglaries under

6    Evidence Code § 1108.  (CT 165-200).

7         Petitioner argues that trial counsel failed to "argue to the court and imform [sic] the jury of

8    "third party culpability" evidence and failed to imform [sic] the jury [or the victim] of the

9    identification of the guilty party."  (Doc. 9, p. 81).  Petitioner contends that Santillan "matches the

10   description of the perpetrator exactly as given by the victim herself," that Santillan was "being

11   investigated as a suspect in a series of burglaries occurring in and around the same area as the

12   victim," and that Santillan eventually pleaded guilty "to being in possession of stolen property from

13   numerous residential burglaries just two months after petitioner's arrest."  (Id., at p. 83).  Petitioner

14   concludes that "[t]hese factors are absolutely undisputed by anyone involved with this case."  (Id.).

15        While those "uncontroverted" facts may suggest that Santillan is a burglar, they do not in

16   any way establish that Santillan was the perpetrator of the Sneed burglary.  Santillan was never a

17   suspect in this case, and the stolen property found in his possession was never connected to Sneed.

18   Also, Santillan was known for breaking glass to burglarize a building, while Petitioner would

19   attempt to break the locks.  (Doc. 9, Exh. 13, p. 3).  Indeed, it is the height of irony that Petitioner,

20   a beneficiary of the trial court's ruling excluding numerous burglaries thought to involve him and

21   which the prosecution unsuccessfully sought to introduce as evidence of Petitioner's modus

22   operandi, should now assert that the mere fact that Santillan was a suspect in other unrelated

23   burglaries should have been presented to the jury as evidence of Petitioner's innocence.

24        Trial counsel followed the trial court's order to avoid eliciting evidence of third-party

25   culpability without first making an offer of proof.  Despite conducting an investigation, counsel was

26   unable to develop sufficient evidence that Santillan was the perpetrator, and so counsel never made

27   an offer of proof.  Trial counsel is not required to fashion defenses out of whole cloth or to perform

28   impossible feats of evidentiary legerdemain in order to render effective assistance to his client.

1   Petitioner has made no showing whatsoever that trial counsel's performance was deficient regarding

2   his claim of third-party culpability.

3          Nor has Petitioner established prejudice.  Petitioner has not shown that there is any other

4   evidence linking Santillan to the Sneed burglary, so there is no reason to believe that had counsel

5   conducted a more thorough investigation that facts would have come to light that would have

6   supported a proper offer of proof or, ultimately, a winning defense of third-party culpability.

7          Accordingly, the trial court's ruling is not contrary to nor an unreasonable application of

8   clearly established federal law.

9                        3.  Late Disclosure Of Alibi Witness.

10         Petitioner next contends that his trial counsel "withheld critical alibi information from the

11  prosecution until near the date of the trial."  (Doc. 9, p. 80).  Petitioner further contends that trial

12  counsel's tardy revelation to the prosecution of this alibi evidence, which purportedly placed

13  "petitioner miles from the crime at the time of the alleged burglary," thereby "stopped the

14  prosecution's investigative processes and triggered the transition of the investigation to a prosecution

15  of the alleged crime."  (Id. at p. 81).  Petitioner further contends that counsel had "no reason not to

16  provide the alibi information early in the proceedings."

17         It appears that Petitioner is arguing that, had his attorney advised the prosecution of the alibi

18  witness at some earlier date, the prosecution would have been satisfied by the alibi evidence that

19  Petitioner was not the perpetrator and would have then pursued other potential suspects rather than

20  prosecuting Petitioner.  Such a claim is spurious.

21         First, there is nothing in the record to suggest that the prosecution would have placed such

22  credence in Petitioner's alibi evidence that it would have foregone prosecution Petitioner.  Rather,

23  the record indicates just the opposite.  The alibi evidence was indeed presented through the

24  testimony of Hope Chacon, who testified that she saw Petitioner in a car at the school attended by

25  Chacon and Petitioner's children, the she almost hit Petitioner's girlfriend and child with her car

26  when they crossed the street, and that she made eye contact with Petitioner after that incident.

27  (RT 970-971).

28  ///

Petitioner's own exhibit to the amended petition also contradicts Petitioner's claim. Detective Grove filed a follow-up police report on August 4, 1999, almost a month before trial, in which she indicated that she had discussed with the prosecutor the possibility that Chacon would testify as a defense witness.  (Doc. 9, Exh. C).  Grove explains her contact with Chacon on the day Petitioner was arrested as follows:

> Prior to Anthony Elizaldi being transported to Headquarters the evening he was taken into custody (12-09-98) he requested that I contacted [sic] Hope Chacon and ask her if she had seen him at the school. I asked him why he would give me her name as a witness. He stated that she was a friend of the family and that she lives in the area. She stated that she may have seen him at the school this date. I asked him if he had seen her there and he stated "no" but she may know something.

> I thought that the request was strange due to the fact that he had not seen her but felt she may know something. As soon as Elizaldi left the office, I immediately ran Hope Chacon through the RMS system (as Anthony did not know her address or telephone, just that she resided in the Pinedale area). I contacted her via telephone at approximately 2150 hours. She identified herself by name, address, and date of birth. I advised her of what had happened this date. I gave her Anthony's name and she stated that she did not know him. I asked her if she knew his girlfriend, Felicia Quintero and advised her of the address of the family members in Pinedale. She hesitated for a few minutes and then said "oh, yes, I know them". She added that she did not know Felicia or Anthony very well, but knew the family. I advised her of the situation and asked her if she recalled seeing Anthony at the school anywhere around 1130 hours this date. She stated that she did not. I asked her if she recalled seeing Felicia and she stated that she did not. I asked her if she was positive, and she stated "yes".  I told her than you very much and concluded the telephone conversation.  The following morning, 12-10-98, Felicia contacted me at approximately 0900 hours. She also asked me to contact Hope Chacon and also advised me that she might have seen something. I told her that I had already contacted Hope and that she stated that she did not see them at the school the day prior.  She stated "okay".

(Doc. 9, Exh. C).

Based on the foregoing, Detective Grove explained in the report that she did no further "follow-up" with Chacon because Petitioner and his girlfriend had not identified Chacon as a witness, but merely as someone who may know something, and because Chacon herself indicated she did not see anything.  (Id.).

Thus, Petitioner's implicit assertion that if the prosecution had learned of Chacon at some earlier point in time, it would have exonerated Petitioner and refused to prosecute him is entirely contradicted by Detective Grove's assertion that she indeed knew of Chacon from the date of Petitioner's arrest, had discussed the events with her, and Chacon had unequivocally indicated she had not seen Petitioner on the day in question. Moreover, the jury heard and considered Petitioner's entire alibi evidence, including Chacon's trial testimony that was a complete about-face from her

earlier statement to Grove.  Accordingly, any purported late disclosure to the prosecution of Hope

Chacon as a witness does not establish deficient performance by trial counsel and could not possibly

have prejudiced Petitioner at trial.

4.  <u>Failure To Investigate Prosecutorial Misconduct</u>.

Petitioner contends that his trial attorney failed to "object to the misconduct of the

prosecution and demand a mistrial when prosecutor continued with the misconduct during cross

examination and nine (9) sustained objections to the prosecutor's impermissible–'Bell ringing'

upon examination of a alibi witness, i.e., Chacon."  (Doc. 9, p. 81).  This contention has no merit.

As discussed in Ground One, the prosecution did not commit misconduct in its cross-

examination of Chacon.  Since there was nothing on which to base a defense charge of misconduct,

defense counsel could not have been ineffective in failing to bring this to the court's attention.

Moreover, as Petitioner himself observes, his trial counsel diligently objected to inappropriate

questions and those objections were sustained.

There can be no Sixth Amendment deprivation of effective counsel based on an attorney's

failure to raise a meritless argument.  <u>See</u> <u>Shah v. United States</u>, 878 F.2d 1156, 1162 (9th Cir.1989);

<u>Rodriguez v. United States</u>, 17 F.3d 225, 226 (8th Cir.1994).  Because there was no prosecutorial

misconduct, then, ipso facto, trial counsel could not have been ineffective for raising non-existent

misconduct as an issue.

**Ground Four**        **Ineffective Assistance Of Appellate Counsel.**

Petitioner finally contends that his appellate counsel rendered ineffective assistance in failing

to file a state habeas petition on his behalf.  (Doc. 9, p. 89).  Petitioner contends that appellate

counsel should have raised issues regarding perjury, instructional error, abuses of discretion by the

trial court, and factual innocence, all of which Petitioner has raised in this petition.  (<u>Id</u>.).  This

contention, too, is without merit.

In challenges to the effective assistance of appellate counsel, the same standards apply as

with the claims of ineffective assistance of trial counsel.  <u>Smith v. Robbins</u>, 528 U.S. 259, 285

(2000); <u>Smith v. Murray</u>, 477 U.S. 527 (1986).  In <u>Smith</u>, the United States Supreme Court indicated

that an appellate attorney filing a merits brief need not and should not raise every non-frivolous

48

1  claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them in order to

2  maximize the likelihood of success on appeal.  Id.  As a result, there is no requirement that an

3  appellate attorney raise issues that are clearly untenable.  Gustave v. United States, 627 F.2d 901,

4  906 (9th Cir. 1980).

5         In preceding sections of this Order, this Court concluded that trial counsel's performance was

6  not been deficient and that Petitioner had not been denied the effective assistance of trial counsel.

7  Moreover, the Court has concluded that the trial court did not abuse its discretion and that

8  Petitioner's claims of prosecutorial misconduct in Ground One are both procedurally barred and

9  without merit.  Since Petitioner bases his claim of ineffective assistance of appellate counsel on the

10  latter's failure to raise these non-meritorious issues on appeal, the claim necessarily fails: no

11  legitimate basis exists for a claim of ineffective assistance on the part of appellate counsel.

12  Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991).

13         Accordingly, Petitioner has failed to show that the state court's adjudication of this issue was

14  contrary to or an unreasonable application of clearly established federal law.  Thus, Ground Four

15  should be denied.

16  **IV.  Petitioner's Motion to Present Before the Court Recent Case Law**

17         On February 16, 2007, Petitioner filed a Motion to Present Before the Court Recent Case

18  Law, requesting the Court to consider additional authority in support of his Federal habeas petition.

19  (Doc. 25). Specifically, Petitioner cites  Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727

20  (2006) in support of his argument that the trial court erroneously excluded evidence that Santillan,

21  not Petitioner, burglarized Sneed's apartment. (Doc. 25, pp. 1-2). Petitioner's reliance on Holmes,

22  however, is entirely misplaced.  In that case, the South Carolina court had excluded evidence that

23  another person had committed the murder with which Holmes was charged because the strength of

24  the prosecution's forensic evidence meant, in its view, that the proffered third-party culpability

25  evidence did not raise a reasonable inference as to Holmes' innocence.  The U.S. Supreme Court

26  reversed the South Carolina Supreme Court's affirmance of the defendant's murder conviction,

27  concluding that "no logical conclusion can be reached" regarding the strength of the defense

28  evidence if a court evaluates only the prosecution's evidence in determining the admissibility of

1  defense evidence. Id. at 1734. The Court, however, acknowledged that states have "broad latitude

2  under the Constitution to establish rules excluding evidence from criminal trials," and that the

3  primary limit on that latitude is whether the rules "guarantee[ ] criminal defendants 'a meaningful

4  opportunity to present a complete defense.'" Id. at 1731. Because the South Carolina rules focused

5  on the strength of the prosecution's evidence, not the evidence proferred by the defense, those rules

6  violated defendant's constitutional rights by "arbitrarily" precluding him from presenting a complete

7  defense. Id. at 1735.

8       Holmes is readily distinguishable from the instant case for two reasons. First, the trial court

9  here, unlike the South Carolina court, did not *prohibit* the introduction of third-party culpability

10  evidence as long as Petitioner was able to meet the threshold minimum of evidence connecting

11  Santillan to the Sneed burglary. Second, the state court's decision that Petitioner had not meet that

12  threshold and its decision therefore to exclude evidence of third-party culpability was based *entirely*

13  on the paucity of defense evidence regarding Santillan, and not, as in Holmes, on the strength of the

14  prosecution's case. For these reasons, Holmes has no applicability to this case.

15       In his motion, Petitioner also asks the Court to consider U.S. v. Jernigan, 451 F.3d 1027

16  (9th Cir.2006). (Doc. 25, pp. 2-3). Petitioner's reliance on Jernigan likewise is unavailing. There,

17  the majority affirmed defendant's conviction for bank robbery despite her claim that the prosecution

18  had withheld information that, after her arrest and while she was awaiting trial, a woman matching

19  her description robbed several other bank. Defendant contended that, if she had known about these

20  robberies at her trial, she could have pointed to a concrete, though unidentified, person with whom

21  the eyewitnesses may have confused her. Id. at 1030. In affirming the conviction, the Ninth Circuit

22  stated that the central issue was whether the eyewitness identification of defendant was certain

23  enough that evidence of possible third-party culpability would not have altered the outcome. After

24  reviewing the eyewitnesses' identification of defendant, the Ninth Circuit concluded that it could not

25  say that "the disclosure of these other bank robberies would have created a reasonable probability

26  of a different result in her trial." Id. at 1033.

27       Petitioner relies on the dissent, which concluded that the evidence might have assisted

28  defendant. However, the dissenting opinion has no precedential value. Rather, the majority opinion

guides this Court.  Here, as in <u>Jernigan</u>, the eyewitness's identification was clear and unequivocal. Since Petitioner and his attorney never developed any evidence connecting Santillan to the Sneed burglary, this Court cannot conclude that evidence of Santillan's guilt would have had any discernable effect on the outcome of the trial.

Petitioner's reliance on the additional authorities cited above is misplaced, and Petitioner's recently-filed Motion seeking relief thereon (Doc. 25), is denied as moot.

**<u>ORDER</u>**

Accordingly, for the reasons set forth above, the Court HEREBY ORDERS as follows:

1.    The Amended Petition for Writ of Habeas Corpus (Doc. 9), is DENIED with prejudice;

2.    The Motion to Present Before the Court Recent Case Law (Doc. 25) is DENIED as MOOT; and

3.    The Clerk of Court is DIRECTED to enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

Dated:  **March 29, 2007**                           **/s/ Theresa A. Goldner**
**j6eb3d**                                     UNITED STATES MAGISTRATE JUDGE